THE ASSOCIATION OF PLUMBING AND HEATING CONTRACTORS OF GREATER NEW YORK, INC., Plaintiff, *v.* WILLIAM MERTEN, Defendant.

Municipal Court of New York, Borough of Manhattan, First District, February 15, 1940.

*Martin Gottlieb*, for the plaintiff.

*William A. Morges*, for the defendant.

McNULTY, J. The problem presented in this case requires an interpretation of a basic principle of the New York State Labor Relations Act. To state the question briefly, it is, have the employers the right under that law to band together in an association and attempt to compel the bargaining agent of their employees, a union, to deal with them collectively through their association. While the action sounds in contract and the plaintiff proceeds on the theory of breach of contract, the basic fundamental to be resolved lies in that question.

The essential facts are practically indisputable. The plaintiff is an association of employers engaged in the plumbing industry, and is hereinafter referred to as the association. This association is composed of small independent plumbing contractors in the city of New York. The defendant was a member of that association at the time this cause of action arose.

During the year June, 1938, to May, 1939 the association had a contract with the "United Association of Journeymen Plumbers and Steamfitters of the United States and Canada, Local 463 Auxiliary," hereinafter referred to as the union. This contract

covered various phases of employer-employee relationship between members of the association and the members of the union employed by them.

During the months of April and May of 1939 the membership of the association passed several resolutions and later on May 10, 1939, reduced these resolutions to writing. As written they were signed by a large portion of the membership, including this defendant. This written contract upon which the plaintiff herein relies sets forth the agreement as follows: *First*, "That no member of the Association should sign an individual agreement with the Union at any time," and *second*, "That no member of the Association should employ any member of the Union with whom we have or had contractual relations with or without a contract, during a strike or lockout without permission of the Association." The contract further provided that since damages in the event of a breach could not be ascertained the signers assented to the imposition of the damages by resolution of the membership, after the membership had found any member violated the agreement, which damages were limited to a sum not exceeding $500.

The agreement with the union expired by its terms on May 31, 1939. Prior to that time the union officials, both local and national, advised the association, through its officers, and through the members of its committees, especially created to deal with the union, that a new policy had been adopted by the union of declining to deal with the association as the bargaining agent of the employers who were members. The association was further advised that the union would offer to the individual members the same labor contract that was given to all plumbing contractors throughout the metropolitan area. The membership of the association determined to resist the union on this question and after the labor contract expired the union struck against the association members.

The defendant was a member of the committee whose function it was to deal with the union. His shop was struck, as were the others, and his place of business was picketed by the members of the union. After the strike had continued for about three weeks the defendant, with several other members of the association, went to the local union headquarters and signed an individual labor contract on June 26, 1939, whereupon the picketing of the shop ceased and his employees returned to work. Prior to the defendant's signing with the union, the evidence indicates that several other members of the association had already signed and thereafter on or about June 29, 1939, the association advised all of its members to sign individual labor contracts directly with the union.

The plaintiff association contends that the action of the defendant constituted a breach of contract and that by virtue of appro-

priate resolutions passed at the meetings, of which he had notice, the defendant was found to have violated his agreement with the association and was liable to it in damages in the sum of $500.

Assuming that the contract was legal in its inception, can the association enforce the provision restraining its members from dealing individually with the chosen representatives of their employees, i. e., the union, and can it enforce the provisions with respect to damages in the event that its members disregard the restraining clauses?

This requires a consideration of the effects of the Labor Law (Art. 20, §§ 700 et seq.), also known as the New York State Labor Relations Act. The court may take judicial notice of the fact that there are numerous industries where both employers and employees bargain through their respective associations by mutual consent, and that great benefits have accrued to the parties and the public generally from long periods of collective bargaining so conducted but in those cases both parties have voluntarily assented to the procedure adopted, whereas in this case the union demurs.

The act in defining the purposes and aims to be achieved and the evils to be rectified states: " Employers in many instances organized in corporate or other forms of ownership associations with the aid of government authority have superior economic power in bargaining with employees. This growing inequality of bargaining power substantially and adversely affects the general welfare of the State." (Labor Law, § 700.)

After thus recognizing the fact that employers are by the very nature of their activity organized and that the weight of economic power is in their hands to the detriment of the general welfare, section 704 of the Labor Law states:

" It shall be an unfair labor practice for an employer: * * *

"(5) To * * * discourage membership in any labor organization by discrimination in regard to hire or tenure or in any term or condition of employment.

"(6) To refuse to bargain collectively with the representatives of employees."

It is significant in considering the act with respect to this case to note the express legislative findings upon which the act is based, and to note further that the provisions describing unfair labor practices refer to an employer.

Since the New York State Labor Relations Act is patterned after the National Labor Relations Act the decisions involving the National act are apposite in cases involving the State act. (Matter of State Labor Relations Bd. v. Interborough News Co., 170 Misc. 347.)

The employer is under an express legal duty to bargain collectively with the chosen representatives of his employees to the end that terms agreeable to both employer and employee may be reached and a contract entered into, thereby promoting industrial peace. A refusal by an employer to bargain collectively is an unfair labor practice. (*National Labor Relations Bd.* v. *Sands Manufacturing Co.*, 306 U. S. 332; *Globe Cotton Mills* v. *National Labor Relations Bd.*, 103 F. [2d] 91; *Matter of Collier Service Corporation* v. *Boland*, 167 Misc. 709.)

While collective bargaining does not require the employer to reach an agreement, it does require sincere negotiations with a view towards settlement of differences. (*National Labor Relations Bd.* v. *Biles Kolman Lumber Co.*, 98 F. [2d] 18; *Jeffry-DeWitt Insulator Co.* v. *National Labor Relations Bd.*, 91 id. 134; *National Labor Relations Bd.* v. *Sands Manufacturing Co.*, *supra.*)

A refusal to reinstate employees because of union activities, including therein union membership, constitutes discrimination and an unfair labor practice. (*Matter of State Labor Relations Bd.* v. *Interborough News Co.*, *supra*; *National Labor Relations Bd.* v. *Mackay Radio and Telegraph Co.*, 304 U. S. 333.) One of the purposes which it was contemplated the act would achieve was to minimize the interruptions in commerce and the industrial strife incidental thereto. In that connection, *vide National Labor Relations Bd.* v. *Carlisle Lumber Co.* (99 F. [2d] 533); *Consolidated Edison Co.* v. *National Labor Relations Bd.* (305 U. S. 197); *National Labor Relations Bd.* v. *Fainblatt* (306 id. 601).

Construing the contract involved in this litigation it would seem quite clear that performance of this contract by the members of the association would require them to commit unfair labor practices. They would be prohibited as individual employers from signing agreements with the union. It would appear in this case that the word " sign " in the contract was synonymous with the word " bargain." Thus the members of the association are inhibited from bargaining collectively with the employees or their chosen representatives. Furthermore, they are required to discriminate against union members in hiring their employees during the period of a strike. The time of reinstatement of employees is of the essence and this contract seeks to delay their rehiring until after the strike has been settled. It would seem that this constitutes a discrimination against employees for union activity, and necessarily these actions on the part of the employer promote and prolong industrial strife.

The banding together of the employers for the purposes set forth in the instant contract further accentuates the disparity in the bargaining power between the parties which the act sought to

equalize and in so doing further promotes industrial strife which the act sought to minimize. It is obvious that employer-employee relations rest upon economic power and that when such power is lodged to too great an extent with one party it is not in the interests of the general welfare. In this connection it should be borne in mind that industrial strife manifests itself not only in strikes and other such spectacular activities but also in the day-to-day relations between employer and employee. Unless such relations are harmonious and based on mutual agreement between equals, industry and commerce are bound to suffer. Thus any arrangement that gives undue strength to employers at this time is contrary to the spirit and the letter of the State Labor Relations Act.

Counsel for the plaintiff strenuously and ably urges that a proper interpretation of the act requires that an association of employers be recognized as an appropriate agency through which employers may bargain with the representatives of the employees. He cites numerous decisions in support of this contention, none of which is in point on the essential question here; that is, the situation when the union refuses to deal with the association. The closest case on the point is *Matter of Ship Owners Association of the Pacific Coast* (7 N. L. R. B. 1002). However, there are several distinguishing features in that case, the most important of which is that there are two contending unions, both claiming that different bargaining units were appropriate. The Labor Board decided that the employers' association was the appropriate unit and based its decision on the long history of collective bargaining during which this unit had been utilized. The decision shows that the union that had originally agreed to this unit now sought to avoid it, but the Board agreed with the union that appeared to be the dominant one. The situation is quite different here where there is only one union and there has been no long history of bargaining relationships between the unions and groups of employers.

Furthermore, such an interpretation overlooks the basic fundamentals upon which the Labor Act was founded. It was determined, and the legislative policy was expressed, that employers were already organized and had attained such strength in bargaining power that employees were unable to successfully bargain collectively with their employers; great weight of economic power rested with the employers and it was determined that such advantages as lay with economic power, thus in the hands of employers, was not advantageous to the general welfare of the State and the nation. For this reason, among others, the acts were passed to aid the employees in organizing so that the economic power between the parties might attain substantial parity. If the acts are inter-

preted at this time to permit employers, already organized as corporations or other aggregations of capital, to further band together in associations and compel employees to deal through such associations, the purposes of the act will not be achieved but the result will be a further inequality of bargaining power. The results will be directly opposite to those sought to be achieved by these labor relations acts. No technical arguments based on isolated words in the statute can be strong enough to meet the force of this very fundamental premise which is implicit and explicit throughout the acts. Had such an interpretation prevailed at any time it is quite easy to be seen that no group of employees could have ever been formed with such economic strength to bargain effectively with associations of employers.

It may be as some earnestly urge that the act goes too far and that it should be amended to be similar in all respects to the National Railway Mediations Act. However, these persons overlook the fact that the railway employees were highly organized before that act was put into effect. In other words, the parties were more nearly on a parity in that instance than they are in industry generally. There are still great gaps in the organization of employees in the State of New York and in the United States, which is no way make the general situation comparable with the railway situation. There are others who urge that the act accords rights to the employees which are denied to the employer. This argument overlooks the fact that employers generally are organized by the very nature of the function which they perform. These remarks, however, need not be continued for it is not the function of the court to deal with these arguments; it is merely for the court to interpret the act as it now stands and leave it to the parties interested to appeal to the Legislature should they desire amendment of the law.

It is elementary that any contract which requires a violation of a statute is against public policy and as such is null and void. (*Minton* v. *Schulte, Inc.*, 153 Misc. 195.) As the court said in the case of *Rosasco Creameries, Inc.*, v. *Cohen* (249 App. Div. 228, 230): "It is unnecessary to elaborate the general principle that contracts in violation of express statutory prohibition are unenforcible." The principle is as old as the common law that a stipulation or condition in a contract involving a breach of duty by the obligor in relation to any matter in which the public interest is involved is unenforcible and void.

For the reasons set forth herein the verdict in this action is directed for the defendant.