## ASSOCIATED PRESS *v.* NATIONAL LABOR RELATIONS BOARD.

No. 365. Argued February 9, 10, 1937.—Decided April 12, 1937.

*Mr. John W. Davis,* with whom *Messrs. William C. Cannon, Harold W. Bissell,* and *Edwin F. Blair* were on the brief, for the petitioner.*

---

* Arguments in this case are summarized from the briefs. Extracts from the oral arguments in this and in the other Labor Act cases will appear in an appendix in the bound volume.

110

112

114

116

*Messrs. Charles E. Wyzanski, Jr.,* and *Charles Fahy,* with whom *Attorney General Cummings, Solicitor General Reed,* and *Messrs. A. H. Feller, Charles A. Horsky, Robert B. Watts, Philip Levy, Laurence A. Knapp,* and *David A. Moscovitz* were on the brief, for respondent.

122

By leave of Court, briefs were filed by *Messrs. Harry Friedman* and *Maurice Friedman,* on behalf of the Commercial Telegraphers' Union, and by *Messrs. Morris L. Ernst, Callman Gottesman* and *Joseph B. Ullman* and *Harriet F. Pilpel,* on behalf of the American Newspaper Guild, as *amici curiae,* supporting the Act.

By leave of Court, a brief was filed by *Mr. Elisha Hanson,* on behalf of the American Newspaper Publishers Association, as *amicus curiae,* challenging the Act.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

In this case we are to decide whether the National Labor Relations Act,[1] as applied to the petitioner by an order of the National Labor Relations Board, exceeds the power of Congress to regulate commerce pursuant to Article I, § 8, abridges the freedom of the press guaranteed by the First Amendment, and denies trial by jury in violation of the Seventh Amendment of the Constitution.

---

[1] July 5, 1935, c. 372, 49 Stat. 449; U. S. C. Supp. I, Tit. 29, §§ 151, etc. The terms of the act, the procedure thereunder, and the relief which may be granted pursuant thereto, are set· forth in the opinion in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., ante,* p. 1.

In October, 1935, the petitioner discharged Morris Watson, an employee in its New York office. The American Newspaper Guild, a labor organization, filed a charge with the Board alleging that Watson's discharge was in violation of § 7 of the National Labor Relations Act, which confers on employees the right to organize, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection; that the petitioner had engaged in unfair labor practices contrary to subsections (1) and (3) of § 8 by interfering with, restraining or coercing Watson in the exercise of the rights guaranteed him by § 7 and by discriminating against him in respect of his tenure of employment and discouraging his membership in a labor organization. The Board served a complaint upon the petitioner charging unfair labor practices affecting commerce within the meaning of the statute. The petitioner answered admitting Watson's discharge but denying that it was due to his joining or assisting the Guild or engaging in union activities, and denying, on constitutional grounds, the validity of the act and the jurisdiction of the Board.

At a hearing before a trial examiner the petitioner appeared specially and moved to dismiss the complaint on constitutional grounds. The motion was overruled on all grounds except upon the question whether the proceeding was within the federal commerce power. Counsel thereupon withdrew from the hearing and the matter was further heard without the participation of the petitioner or its counsel. After receiving voluminous evidence as to the character of the petitioner's business, the examiner overruled the contention that interstate commerce was not involved and proceeded to hear the merits. At the close of the hearing he recommended that an order be entered against the petitioner. Notice of the filing of this report

and of hearing thereon by the Board was given the petitioner but it failed to appear. Based upon the examiner's report the Board made findings of fact, stated its conclusions of law, and entered an order that the Associated Press cease and desist from discouraging membership in the American Newspaper Guild or any other labor organization of its employees, by discharging, threatening to discharge, or refusing to reinstate any of them for joining the Guild or any other labor organization of its employees, and from discriminating against any employee in respect of hire, or tenure of employment, or any term or condition of employment for joining the Guild or any other such organization, and from interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in § 7 of the Act. It further enjoined the Associated Press to offer Watson reinstatement to his former position without prejudice to any rights and privileges previously enjoyed by him; to make him whole for any loss of pay suffered by reason of his discharge; to post notices in its New York office stating it would cease and desist from the enjoined practices, and to keep such notices posted for thirty days.[2]

The petitioner refused to comply with the order, and the Board, pursuant to § 10 (e) of the Act, petitioned the Circuit Court of Appeals for enforcement. The petitioner answered, again setting up its contentions with respect to the constitutionality of the act as applied to it. After argument, the court made a decree enforcing the order.[3]

In its answer to the Board's petition for enforcement, the petitioner did not challenge the Board's findings of fact, and no error is assigned in this court to the action of the Circuit Court of Appeals in adopting them. We, therefore, accept as established that the Associated Press

---

[2] 1 N. L. R. B. 788.
[3] 85 F. (2d) 56.

did not, as claimed in its answer before the Board, discharge Watson because of unsatisfactory service, but, on the contrary, as found by the Board, discharged him for his activities in connection with the Newspaper Guild. It follows that § 8, subsections (1) and (3) authorize the order, and the only issues open here are those involving the power of Congress under the Constitution to empower the board to make it in the circumstances.

*First.* Does the statute, as applied to the petitioner, exceed the power of Congress to regulate interstate commerce? The solution of this issue depends upon the nature of the petitioner's activities, and Watson's relation to them. The findings of the Board in this aspect are unchallenged, and the question becomes, therefore, solely one of law to be answered in the light of the uncontradicted facts.

The Associated Press is a membership corporation under the laws of New York which does not operate for profit but is a coöperative organization whose members are representatives of newspapers. It has about 1350 members in the United States and practically all the newspapers represented in its membership are conducted for profit. Its business is the collection of news from members and from other sources throughout the United States and foreign countries and the compilation, formulation, and distribution thereof to its members. In the process, the news is prepared for members' use by editing, rewriting, selecting, or discarding, the information received, in whole or in part. The product is transmitted to member newspapers and also to foreign agencies pursuant to mutual exchange agreements. The service is not sold but the entire cost is apportioned amongst the members by assessment.

Petitioner maintains its principal office in New York City but has also division points scattered over the United

States each of which is charged with the duty of collecting information from a defined territory and preparing and distributing it to newspapers within the assigned area and to other division points for use within their respective areas. Each member newspaper forwards news deemed important to the divisional headquarters of its area. In addition, employees of the petitioner obtain news which is transmitted to the appropriate division headquarters to be edited and forwarded to members within the area represented by that headquarters and to other divisions for distribution to member newspapers within their respective areas. The means of communication commonly used in receiving and transmitting news consists of wires leased from telegraph and telephone companies, but messenger service, the wireless, and the mail are also employed. Each division point is connected with every other by telegraph wires for exchange of news. Regional circuits supplement these primary circuits. All these lines of communication are utilized throughout the twenty-four hours of every day.

Consideration of the relation of Watson's activities to interstate commerce may be confined to the operations of the New York office where he was employed. This office is the headquarters of the Eastern Division and, through it operates the petitioner's foreign service, with offices, staffs, and correspondents throughout the world. News received in New York from foreign parts, from newspaper members within the Eastern Division, and from other division points, is edited by employees acting under the direction of supervising editors and, in its edited form, is transmitted throughout the division and to the headquarters of other divisions. The distributees of any given item are selected by those employed for the purpose in accordance with their judgment as to the usefulness of that item to the members or the divisions to which

it is transmitted. Thus the New York office receives and dispatches news from and to all parts of the world, in addition to that from New York State and other northeastern and Middle Atlantic States which comprise the Eastern Division. The work of the office is divided into two departments known as the Traffic Department and the News Department. All those employed in the actual receipt and transmission of news are in the Traffic Department; all others, including editorial employees, are grouped in the News Department. Watson, at the time of his discharge, was in the latter class, whose duty is to receive, rewrite, and file for transmission news coming into the office. An executive news editor, assisted by supervising editors and editorial employees, has general charge of the revision of news received from so-called filing editors who are in immediate charge of the telegraph wires connecting with the sources and destination of news. These filing editors supervise the news as it goes out from New York City; they determine what news, from the total copy delivered to them, is to be sent over the wires of which they have charge to the area reached by those wires, and they have charge of rewriting such copy as it comes from the other editors as may be appropriate for use in their respective circuits and the delivery of the selected and rewritten news to teletype operators for transmission over their wires. The function of editors and editorial employees such as Watson is to determine the news value of items received and speedily and accurately to rewrite the copy delivered to them, so that the rewritten matter shall be delivered to the various filing editors who are responsible for its transmission, if appropriate, to the areas reached by their circuits.

Upon the basis of these facts the Board concluded that the Associated Press was engaged in interstate commerce; that Watson's services bore a direct relation to petitioner's

interstate commerce activities; and that labor disputes between petitioner and employees of his class, and labor disturbances or strikes affecting that class of employees, tend to hinder and impede interstate commerce. These conclusions are challenged by the petitioner.

Section 2 (6) of the Act defines the term "commerce" as meaning "trade, traffic, commerce, transportation, or communication among the several States . . . or between any foreign country and any State . . ." Subsection (7) provides: "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce."

The Associated Press is engaged in interstate commerce within the definition of the statute and the meaning of Article I, § 8 of the Constitution. It is an instrumentality set up by constituent members who are engaged in a commercial business for profit, and as such instrumentality acts as an exchange or clearing house of news as between the respective members, and as a supplier to members, of news gathered through its own domestic and foreign activities. These operations involve the constant use of channels of interstate and foreign communication. They amount to commercial intercourse, and such intercourse is commerce within the meaning of the Constitution.[4] Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution.[5] This conclusion is unaffected by the fact that the petitioner

---

[4] *Gibbons* v. *Ogden*, 9 Wheat. 1, 189.

[5] *Pensacola Telegraph Co.* v. *Western Union*, 96 U. S. 1, 9, 10; *Federal Radio Comm'n* v. *Nelson Bros. Co.*, 289 U. S. 266, 279; *International Textbook Co.* v. *Pigg*, 217 U. S. 91, 107; *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co.*, 293 U. S. 268, 276.

does not sell news and does not operate for profit,[6] or that technically the title to the news remains in the petitioner during interstate transmission.[7] Petitioner being so engaged in interstate commerce, the Congress may adopt appropriate regulations of its activities for the protection and advancement, and for the insurance of the safety of, such commerce.

The National Labor Relations Act seeks to protect the employees' right of collective bargaining, and prohibits acts of the employer discriminating against employees for union activities and advocacy of such bargaining, by denominating them unfair practices to be abated in accordance with the terms of the act. As is shown in the opinion in *Virginian Ry. Co.* v. *System Federation No. 40*, 300 U. S. 515, the experience under the Railway Labor Act has demonstrated the efficacy of such legislation in preventing industrial strikes and obviating interference with the flow of interstate commerce. The petitioner, however, insists that editorial employees such as Watson are remote from any interstate activity and their employment and tenure can have no direct or intimate relation with the course of interstate commerce. We think, however, it is obvious that strikes or labor disturbances amongst this class of employees would have as direct an effect upon the activities of the petitioner as similar disturbances amongst those who operate the teletype machines or as a strike amongst the employees of telegraph lines over which petitioner's messages travel.

In *Texas & N. O. R. Co.* v. *Brotherhood of Railway and Steamship Clerks*, 281 U. S. 548, 570, we held a statute

---

[6] *United States* v. *Hill*, 248 U. S. 420; *United States* v. *Simpson*, 252 U. S. 465.

[7] *Pipe Line Cases*, 234 U. S. 548, 560.

protecting the rights of collective bargaining by railway employees was within the competence of Congress under the commerce clause and that its provisions extended to clerks who had no direct contact with the actual facilities of railway transportation. We there said:

"Exercising this authority, Congress may facilitate the amicable settlement of disputes which threaten the service of the necessary agencies of interstate transportation. In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures. The legality of collective action on the part of employees in order to safeguard their proper interests is not to be disputed. It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife."

In *Virginian Railway Co.* v. *System Federation No. 40, supra,* we have held an amendment of the Railway Labor Act, in all material respects analogous to the statute here under consideration, applicable to so-called back-shop employees of railroads despite the contention that their employment is remote from interstate transportation.

These decisions foreclose the petitioner's contention that Watson's employment had no relation to interstate commerce and could not be subjected to the regulatory provisions of the National Labor Relations Act.

*Second.* Does the statute, as applied to the petitioner, abridge the freedom of speech or of the press, safeguarded by the First Amendment? We hold that it does not. It

is insisted that the Associated Press is in substance the press itself, that the membership consists solely of persons who own and operate newspapers, that the news is gathered solely for publication in the newspapers of members. Stress is laid upon the facts that this membership consists of persons of every conceivable political, economic, and religious view, that the one thing upon which the members are united is that the Associated Press shall be wholly free from partisan activity or the expression of opinions, that it shall limit its function to reporting events without bias in order that the citizens of our country, if given the facts, may be able to form their own opinions respecting them. The conclusion which the petitioner draws is that whatever may be the case with respect to employees in its mechanical departments it must have absolute and unrestricted freedom to employ and to discharge those who, like Watson, edit the news, that there must not be the slightest opportunity for any bias or prejudice personally entertained by an editorial employee to color or to distort what he writes, and that the Associated Press cannot be free to furnish unbiased and impartial news reports unless it is equally free to determine for itself the partiality or bias of editorial employees. So it is said that any regulation protective of union activities, or the right collectively to bargain on the part of such employees, is necessarily an invalid invasion of the freedom of the press.

We think the contention not only has no relevance to the circumstances of the instant case but is an unsound generalization. The ostensible reason for Watson's discharge, as embodied in the records of the petitioner, is "solely on the grounds of his work not being on a basis for which he has shown capability." The petitioner did not assert and does not now claim that he had shown bias in the past. It does not claim that by reason

of his connection with the union he will be likely, as the petitioner honestly believes, to show bias in the future. The actual reason for his discharge, as shown by the unattacked finding of the Board, was his Guild activity and his agitation for collective bargaining. The statute does not preclude a discharge on the ostensible grounds for the petitioner's action; it forbids discharge for what has been found to be the real motive of the petitioner. These considerations answer the suggestion that if the petitioner believed its policy of impartiality was likely to be subverted by Watson's continued service, Congress was without power to interdict his discharge. No such question is here for decision. Neither before the Board, nor in the court below, nor here has the petitioner professed such belief. It seeks to bar all regulation by contending that regulation in a situation not presented would be invalid. Courts deal with cases upon the basis of the facts disclosed, never with nonexistent and assumed circumstances.

The act does not compel the petitioner to employ anyone; it does not require that the petitioner retain in its employ an incompetent editor or one who fails faithfully to edit the news to reflect the facts without bias or prejudice. The act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees. The restoration of Watson to his former position in no sense guarantees his continuance in petitioner's employ. The petitioner is at liberty, whenever occasion may arise, to exercise its undoubted right to sever his relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the act declares permissible.

The business of the Associated Press is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws. He has no special privi-

lege to invade the rights and liberties of others. He must answer for libel.[8] He may be punished for contempt of court.[9] He is subject to the anti-trust laws.[10] Like others he must pay equitable and nondiscriminatory taxes on his business.[11] The regulation here in question has no relation whatever to the impartial distribution of news. The order of the Board in nowise circumscribes the full freedom and liberty of the petitioner to publish the news as it desires it published or to enforce policies of its own choosing with respect to the editing and rewriting of news for publication, and the petitioner is free at any time to discharge Watson or any editorial employee who fails to comply with the policies it may adopt.

*Third.* The contentions that the act deprives the petitioner of property without due process, that the order of the Board deprives petitioner of the right to trial by jury, and that the act is invalid on its face because it seeks to regulate both interstate and intrastate commerce, are sufficiently answered in the opinion in *Texas and N. O. R. Co.* v. *Brotherhood of Railway and Steamship Clerks, supra,* and in *National Labor Relations Board* v. *Jones & Laughlin Steel Corp., ante,* p. 1, and need no further discussion here.

The judgment of the Circuit Court of Appeals is

*Affirmed.*

Mr. Justice Sutherland, dissenting.

Mr. Justice Van Devanter, Mr. Justice McReynolds, Mr. Justice Butler and I think the judgment below should be reversed.

One of the points made in the court below, and assigned as error here is that the statute involved, as applied,

---

[8] *Robertson* v. *Baldwin,* 165 U. S. 275, 281.

[9] *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402.

[10] *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co., supra.*

[11] *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250.

abridges the freedom of the press in violation of the First Amendment.

The Associated Press is engaged in collecting, editing and distributing news to its members, publishers of some 1300 newspapers throughout the United States. These newspapers represent many diverse policies and many differences in point of view. It, obviously, is essential that the news furnished should not only be without suppression but that it should be, as far as possible, free from color, bias or distortion. Such is the long-established policy of the Associated Press. If the Congressional act here involved, upon its face or in its present application, abridges the freedom of petitioner to carry its policy into effect, the act to that extent falls under the condemnation of the First Amendment. We shall confine ourselves to that question, the gravity of which is evident; but we do not mean thereby to record our assent to all that has been said with regard to other questions in the case.

The first ten amendments to the Constitution safeguard the fundamental rights therein mentioned from every form of unpermitted federal legislation. The due process clause of the Fifth Amendment protects the person against deprivation of life, liberty or property except by due process of law. "Liberty" is a word of wide meaning, and, without more, would have included the various liberties guaranteed by the First Amendment. *De Jonge* v. *Oregon,* 299 U. S. 353, 364, and cases cited; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 243–245; *Near* v. *Minnesota,* 283 U. S. 697, 707; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535.

But the framers of the Bill of Rights, regarding certain liberties as so vital that legislative denial of them should be specifically foreclosed, provided by the First Amendment:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The difference between the two amendments is an emphatic one and readily apparent. Deprivation of a liberty not embraced by the First Amendment, as for example the liberty of contract, is qualified by the phrase "without due process of law"; but those liberties enumerated in the First Amendment are guaranteed without qualification, the object and effect of which is to put them in a category apart and make them incapable of abridgment by any process of law. That this is inflexibly true of the clause in respect of religion and religious liberty cannot be doubted; and it is true of the other clauses save as they may be subject in some degree to rare and extreme exigencies such as, for example, a state of war. Legislation which contravenes the liberties of the First Amendment might not contravene liberties of another kind falling only within the terms of the Fifth Amendment. Thus, we have held that the governmental power of taxation, one of the least limitable of the powers, may not be exerted so as to abridge the freedom of the press (*Grosjean* v. *American Press Co.*, *supra*), albeit the same tax might be entirely valid if challenged under the "liberty" guaranty of the Fifth Amendment, apart from those liberties embraced by the First. Compare *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 482–483.

No one can read the long history which records the stern and often bloody struggles by which these cardinal rights were secured, without realizing how necessary it is to preserve them against any infringement, however slight. For, as Mr. Justice Bradley said in *Boyd* v. *United States,* 116 U. S. 616, 635, "illegitimate and unconstitutional practices get their first footing in that way, namely,

by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*" "Experience should teach us," it was said in another case, "to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead* v. *United States,* (dissent), 277 U. S. 471, 479. A little water, trickling here and there through a dam, is a small matter in itself; but it may be a sinister menace to the security of the dam, which those living in the valley below will do well to heed.

The destruction or abridgment of a free press—which constitutes one of the most dependable avenues through which information of public and governmental activities may be transmitted to the people—would be an event so evil in its consequences that the least approach toward that end should be halted at the threshold.

The grants of the Constitution always are to be read in the light of the restrictions. Thus, the exercise of the power to make laws on the subject of bankruptcies, the exercise of the war powers, of the power to tax, of the power to exclude aliens, or of the power to regulate commerce, is each subject to the qualified restrictions of the Fifth Amendment (*Louisville Bank* v. *Radford,* 295 U. S. 555, 589); as each, also, is subject, so far as appropriate, to the unqualified restrictions of the First. Congress has no power to regulate the relations of private employer and employee as an end in itself, but only if that be an appropriate and legitimate means to a constitutional end, which here is the regulation of interstate commerce. Assuming that the statute upon its face satisfies this test, does the

present application of it satisfy the requirement that the freedom of the press shall not be abridged?'

Freedom is not a mere intellectual abstraction; and it is not merely a word to adorn an oration upon occasions of patriotic rejoicing. It is an intensely practical reality, capable of concrete enjoyment in a multitude of ways day by day. When applied to the press, the term freedom is not to be narrowly confined; and it obviously means more than publication and circulation. If freedom of the press does not include the right to adopt and pursue a policy without governmental restriction, it is a misnomer to call it freedom. And we may as well deny at once the right of the press freely to adopt a policy and pursue it, as to concede that right and deny the liberty to exercise an uncensored judgment in respect of the employment and discharge of the agents through whom the policy is to be effectuated.

In a matter of such concern, the judgment of Congress—or, still less, the judgment of an administrative censor—cannot, under the Constitution, be substituted for that of the press management in respect of the employment or discharge of employees engaged in editorial work. The good which might come to interstate commerce or the benefit which might result to a special group, however large, must give way to that higher good of all the people so plainly contemplated by the imperative requirement that "Congress shall make *no* law . . . abridging the freedom . . . of the press."

The present case illustrates the necessity for the enforcement of these principles. The board found, in effect, that the actual reason for Watson's discharge was his activity as a member of a labor organization in the furtherance of its aims. Accepting this as a true statement of the reason for the discharge, let us consider the question from the standpoint of that finding; although, as already indicated, we are of opinion that the constitutional im-

munity of the press does not permit any legislative restriction of the authority of a publisher, acting upon his own judgment, to discharge anyone engaged in the editorial service. Such a restriction of itself would be an abridgment of the freedom of the press no less than a law restricting the constitutional liberty of one to speak would be an abridgment of the freedom of speech.

For many years there has been contention between labor and capital. Labor has become highly organized in a wide effort to secure and preserve its rights. The daily news with respect to labor disputes is now of vast proportions; and clearly a considerable part of petitioner's editorial service must be devoted to that subject. Such news is not only of great public interest; but an unbiased version of it is of the utmost public concern. To give a group of employers on the one hand, or a labor organization on the other, power of control over such a service is obviously to endanger the fairness and accuracy of the service. Strong sympathy for or strong prejudice against a given cause or the efforts made to advance it has too often led to suppression or coloration of unwelcome facts. It would seem to be an exercise of only reasonable prudence for an association engaged in part in supplying the public with fair and accurate factual information with respect to the contests between labor and capital, to see that those whose activities include that service are free from either extreme sympathy or extreme prejudice one way or the other. And it would be no answer to say that dealing with news of this character constitutes only a part of the duties of the editorial force. The interest of a juror, for example, in the result, which excludes him from sitting in a case, may be small and the adverse effect upon his verdict by no means certain. Nevertheless, the party affected cannot be called upon to assume the hazard. In the present case, by a parity of reasoning, the hope of benefit to a cherished cause which may bias the edi-

torial employee is a contingency the risk of which the press in the exercise of its unchallengeable freedom under the Constitution may take or decline to take, without being subject to any form of legislative coercion.

What, then, are the facts here involved? Morris Watson was employed by petitioner first in 1928 as a reporter and rewrite editor in petitioner's Chicago office. In 1930, he was transferred to the New York office, and there served as editorial employee until his discharge on October 18, 1935. One of his duties was to rewrite and supervise the news received at the New York office and determine what portion of it should be sent to points outside. As the court already has pointed out, he had authority to determine the news value of items received and was required to speedily and accurately rewrite the copy delivered to him.

In November, 1933, Watson was instrumental in organizing the Associated Press Unit of the New York Newspaper Guild, a labor organization, constituting a part of the American Newspaper Guild; and he was, from the beginning, recognized as the outstanding union representative of the press associations. He served successively as chairman of the Associated Press Unit and as treasurer and secretary of the New York Guild, and at the time of his discharge was vice-president for wiring services of the American Guild. His guild activities were immediately objected to by petitioner; and thereafter, on numerous occasions, these activities were objected to by petitioner's executives and inducements were held out to him to abandon them. The findings of the board disclose that Watson continued in various ways to promote the interests of the guild; and there is no doubt that his sympathies were strongly enlisted in support of the guild's policies, whether they clashed with the policies of petitioner or not. We do not question his right to assume and maintain that attitude. But, if petitioner con-

cluded, as it well could have done, that its policy to preserve its news service free from color, bias or distortion was likely to be subverted by Watson's retention, what power has Congress to interfere in the face of the First Amendment?

And that question may not be determined by considering Watson only; for the power to compel his continuance in the service includes the power to compel the continuance of all guild members engaged in editorial work, with the result that the application of the statute here made, if carried to the logical extreme, would give opportunity for the guild to exercise a high degree of control over the character of the news service. Due regard for the constitutional guaranty requires that the publisher or agency of the publisher of news shall be free from restraint in respect of employment in the editorial force. And we are dealing here not with guild members employed in the mechanical or purely clerical work of the press but with those engaged as Watson was in its editorial work and having the power thereby to affect the execution of its policies.

An illustration may be helpful: The right to belong to a labor union is entitled to the shield of the law, but no more so than the right not to belong. Neither can be proscribed. So much must be true, or we do not live in a free land. Let us suppose the passage of a statute of like character with that under review, having the same objective, but to be effected by forbidding the discharge of employees on the ground not that they are but that they are not members of a labor association. Let us suppose further that a labor association is engaged in publishing an interstate-circulated journal devoted to furthering the interests of labor, and that members of its editorial staff, resigning their membership in the association, transfer their allegiance from the cause of the workingman to that of the employer. Can it be doubted that an order re-

quiring the reinstatement of an editorial writer who had been discharged under these circumstances would abridge the freedom of the press guaranteed by the First Amendment?

And if that view of the amendment may be affirmed in the case of a publication issued for the purpose of advancing a particular cause, how can it be denied in the case of a press association organized to gather and edit the news fairly and without bias or distortion for the use of all causes? To hold that the press association must await a concrete instance of misinterpretation of the news before it can act is to compel it to experiment with a doubt when it regards certainty as essential.

The conclusion that the First Amendment is here infringed does not challenge the right of employees to organize, to bargain collectively with their employers about wages and other matters respecting employment, or to refuse to work except upon conditions they are willing to accept. Nor, the First Amendment aside, does it challenge the act in so far as it is an allowable regulation of interstate commerce. All affirmations in respect of these matters may be fully conceded without prejudice to our very definite view that the application of the act here has resulted in an unconstitutional abridgment of the freedom of the press.

Do the people of this land—in the providence of God, favored, as they sometimes boast, above all others in the plenitude of their liberties—desire to preserve those so carefully protected by the First Amendment: liberty of religious worship, freedom of speech and of the press, and the right as freemen peaceably to assemble and petition their government for a redress of grievances? If so, let them withstand all *beginnings* of encroachment. For the saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time.