In the Matter of NEW YORK STATE LABOR RELATIONS BOARD, Petitioner, against INTERBOROUGH NEWS COMPANY, Respondent.

In the Matter of the Application of INTERBOROUGH NEWS COMPANY EMPLOYEES MUTUAL BENEFIT ASSOCIATION, Petitioner, against NEW YORK STATE LABOR RELATIONS BOARD and INTERBOROUGH NEWS COMPANY, Respondents.

Supreme Court, Special Term, New York County, February 1, 1939.

*Burton A. Zorn* and *Daniel Kornblum,* for the New York State Labor Relations Board.

*Schultz Bros.,* for the Interborough News Company.

*Phillip Berman,* for the Interborough News Company Employees Mutual Benefit Association.

COLLINS, J. These two motions concern an order of the New York State Labor Relations Board (herein called the Board) which adjudges the Interborough News Company Employees Mutual Benefit Association (herein referred to as Mutual) to be a company union and decrees its virtual dissolution, and which order directs the Interborough News Company (herein termed Company) to reinstate Lucille K. Beyer to a position with the Company equivalent to that from which she was discharged for what the Board found to be hostile activities in behalf of another union — Bookkeepers, Stenographers and Accountants Union, Local 16, United Office and Professional Workers of America C. I. O. (herein called C. I. O.). Scraped of camouflage, the engagement is between Company and C. I. O.

The order derives from section 706 of the Labor Law. The New York State Labor Relations Act, article 20 of the Labor Law (§§ 700–716), added by chapter 443 of the Laws of 1937 (herein called Act), is sometimes alluded to as the " Little Wagner Act," and which patterns the National Labor Relations (Wagner) Act. Thus, decisions on the National act are apposite here.

One motion is by the Board for enforcement of its order, and the other is by Mutual for a vacation or modification of the order. The Company does not resist the Board's application in so far as the order affects Mutual. Mutual, however, does stoutly challenge the order which ordains its demise, and insists that it is not a company union dominated by the Company, but a voluntary association of Company's employees and utterly free from Company's domination, rule, control or dictation.

The Board predicated its decision on 700 pages of testimony adduced before a trial examiner, and this proceeding summons that testimony for review.

But such review is not without circumscription. Section 707, subdivision 2, of the Act provides that " The findings of the Board as to the facts, if supported by evidence, shall be conclusive."

Judicial construction of this provision has prefixed " evidence " with " substantial." If the Board's findings are buttressed by substantial evidence they are conclusive, and the facts are not to be reviewed by the court, except to ascertain the presence of substantial evidence. (*Associated Press* v. *National Labor Relations Board*, 301 U. S. 103; *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board*, Id. 142.) It is for the Board, not for the court, to draw inferences from the evidence (*National Labor Relations Board* v. *Oregon Worsted Co.*, 94 F. [2d] 671; *National Labor Relations Board* v. *Remington Rand, Inc.*, Id. 862, 871), " and it is well settled that we have no power to pass upon the credibility of witnesses or to substitute our judgment on questions of fact for that of the Board." (*National Labor Relations Board* v. *Wallace Mfg. Co.*, 95 F. [2d] 818, 820.) " The question is not whether this court would have reached the same conclusion." (*Consolidated Edison Co.* v. *National Labor Relations Board*, 95 F. [2d] 390, 397.) " Whatever the views of the reviewing court may be as to the weight of the evidence, it must nevertheless accept as final the findings of fact made by the Labor Relations Board, if there is substantial evidence to support them." (*Matter of Collier Service Corporation* v. *Boland*, 167 Misc. 709, 711; *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board*, supra.)

What is *substantial* evidence? It is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. " Substantial evidence " means more than a mere scintilla. It is of substantial and relevant consequence and excludes vague, uncertain or irrelevant matter. It implies a quality of proof which induces conviction and makes an impression on reason. It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction. The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power. Testimony is the raw material out of which we construct truth and, unless all of it is weighed in its totality errors will result and great injustices be wrought. (*National Labor Relations Board* v. *Thompson*

*Products, Inc.*, 97 F. [2d] 13, 15; *National Labor Relations Board* v. *Union Pacific Stages, Inc.*, 99 id. 153; *Ballston-Stillwater Knitting Company, Inc.*, v. *National Labor Relations Board*, 98 id. 758.) " The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." (*Appalachian Electric P. Co.* v. *National Labor Relations Board*, 93 F. [2d] 985; *National Labor Relations Board* v. *Bell Oil & Gas Co.*, 98 id. 406.)

The issue here, then, is the substantiality of the evidence which supports the assailed order. Examination of this question must take into reckoning the evils which the Act seeks to rectify.

The Act signalizes the progress of industrial democracy. It accords legal recognition to the principle that unionism is not only compatible with our free institutions but that it stems from the ideal that in a democracy workers must be at liberty to organize for their mutual protection and welfare, that their organizations be uncoerced and unintimidated by their employers, and that they be permitted to speak through representatives of their own choosing, so that their voice is not an echo of their employer's voice. A ventriloquist or puppet union is deemed unhealthy not alone for the workers but for a democratic society.

The policy of the Act, found in section 700, is expressed thus: " In the interpretation and application of this article, and otherwise, it is hereby declared to be the public policy of the State to encourage the practice and procedure of collective bargaining and to protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection, free from the interference, restraint or coercion of their employers. All the provisions of this article shall be liberally construed for the accomplishment of this purpose."

Section 701, subdivision 6, defines " company union " as " any committee, employee representation plan or association of employees which exists for the purpose, in whole or in part, of dealing with employers concerning grievances or terms and conditions of employment, which the employer has initiated or created or whose initiation or creation he has suggested, participated in or in the formulation

of whose governing rules or policies or the conducting of whose management, operations or elections the employer participates in or supervises or which the employer maintains, finances, controls, dominates or assists in maintaining or financing, whether by compensating anyone for services performed in its behalf or by donating free services, equipment, materials, office or meeting space or anything else of value, or by any other means."

Section 703 declares that " Employees shall have the right of self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion of employers."

Section 704 specifies certain acts as constituting " unfair labor practices."

In sum, the Act is an implemented warning to employers to keep hands off the union aspirations and activities of their employees. No matter how remote the control, how indirect the domination, how devious the dictation, how subtle the influence, how circuitous the coercion, or how disguised the intimidation, if the absolute freedom of the worker respecting union activities is discouraged or abridged or interfered with, the Act bludgeons it.

Applying the above principles to this proceeding, what is the relation between the Act and the facts?

C. I. O. charged Company with unfair labor practices by forming Mutual and by discharging Miss Beyer for her antagonism to Mutual and her pronounced preference for C. I. O.

Company sells and distributes newspapers, books and periodicals, employing about 726 persons in various units. Some of these units are affiliated with the A. F. of L. and some with C. I. O. Company has five different contracts with various locals of both of these national parent organizations and with an independent association.

Company employed one Daniel J. Hanlon as manager of its research division. He was very close to S. P. Booth, Company's president; they had been intimate friends for thirty-five years. C. I. O. became active in exhorting Company's employees to join C. I. O. unions. To counteract these activities Hanlon suggested to Booth an association of Company's workers. Permission granted, preliminary conferences and meetings (some held in Company's building) resulted in Mutual, with approximately 257 of Company's employees engaged in inspection and general office help.

The evidence sustains the Board's finding that in conceiving and inspiring Mutual Hanlon was motivated by the interests of Company rather than by the welfare of the employees. The indications

are that the real promoter was Company. Hanlon's intentions may have been of the best, and Booth's consent and interest may have issued from the goodness of his heart for the contentment of his employees. But it is employer influence, benevolent or malevolent, which the Act shuns and strives to avert.

In *Texas & New Orleans R. R. Co.* v. *Brotherhood of Railway & Steamship Clerks* (281 U. S. 548), Chief Justice HUGHES, for the court, pertinently said (at p. 560): " The circumstances of the soliciting of authorizations and memberships on behalf of the Association, the fact that employees of the Railroad Company who were active in promoting the development of the Association were permitted to devote their time to that enterprise without deduction from their pay, the charge to the Railroad Company of expenses incurred in recruiting members of the Association, the reports made to the Railway Company of the progress of these efforts, and the discharge from the service of the Railroad Company of leading representatives of the Brotherhood and the cancellation of their passes, gave support, despite the attempted justification of these proceedings, to the conclusion of the courts below that the Railroad Company and its officers were actually engaged in promoting the organization of the association in the interest of the Company and in opposition to the Brotherhood, and that these activities constituted an actual interference with the liberty of the clerical employees in the selection of their representatives."

Subdivision 3 of section 704 of the Act declares it an unfair labor practice " to dominate or interfere with the formation, existence, or administration of any employee organization or association, agency or plan which exists in whole or in part for the purpose of dealing with employers concerning terms or conditions of employment, labor disputes or grievances, or to contribute financial or other support to any such organization, by any means, including but not limited to the following: (a) by participating or assisting in supervising, controlling or dominating (1) the initiation or creation of any such employee organization or association, agency, or plan, or (2) the meetings, management, operation, elections, formulation or amendment of constitution, rules or policies, of any such employee organization or association, agency or plan; (b) by urging the employees to join any such employee organization or association, agency or plan for the purpose of encouraging membership in the same; (c) by compensating any employee or individual for services performed in behalf of any such employee organization or association, agency or plan, or by donating free services, equipment, materials, office or meeting space or anything else of value for the use of any such employee organization or association, agency or

plan; provided that, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

The conclusion that Mutual is a Company union, and thus comes within the sweep of the Act's condemnation, finds abundant sustenance in the record.

It is obvious, too, that Miss Beyer was discharged for union activities, and particularly for her espousal of C. I. O. against Mutual. As a militant C. I. O. adherent she assisted in the preparation of C. I. O. circulars which assailed Mutual as Company-inspired. She entered Company's employ on May 9, 1935, as secretary to George Booth, head of Company's vending machine department. In October, 1936, she joined C. I. O. Until her manifested antagonism to Mutual her services were satisfactory to her employer. Then she was transferred to a department admittedly overstaffed. The head of this other department " didn't need a girl," and he so informed his superior. After remaining in the transferred position for a short period she was discharged as unnecessary. The suspicion is nigh conviction that the transfer was designed to effect an ultimate dismissal. Certainly, from the circumstances, the Board was not indulging in conjecture in arriving at this determination.

Section 704, subdivision 4, provides that it shall be an unfair labor practice " to require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his own choosing." And under subdivision 5 it is an unfair labor practice " to encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment."

Though it is quite understandable that Miss Beyer was not wanted in her confidential secretarial position, the evidence supports the finding that her discharge violated both the letter and spirit of the Act.

The evidence does not sustain the Company's insistence that Miss Beyer has obtained other employment equivalent to that from which she was discharged. The testimony on this point is tenuous; it might have been more clear and definite, but it points to only temporary employment. The replacement of Miss Beyer with the Company is a matter which the Board can adjust.

Also, the form and wording of the " cease and desist " notice, which the Board has ordered the Company to post, should be agreed upon. (*National Labor Relations Board* v. *Pennsylvania*

*Greyhound Lines,* 303 U. S. 261; *National Labor Relations Board* v. *Mackay Radio & Tel. Co.,* 304 id. 333.) Unnecessary embarrassment to the Company is to be avoided.

It may be, as some earnestly urge, that the Act goes too far. There are those who hold that the Act accords rights to the workers which are denied to the employer, and that the influence of the Act is not sufficiently unifying or moderating. But the abuses which the Act seeks to cure were acute and rampant. And it is not improbable that the weight of the abuses has freighted the scales on the side of the worker instead of keeping them equably and equitably balanced between employer and employee. Certainly the Act invests the Board with vast and drastic powers. If, however, the Act requires modification the job is the Legislature's, not the court's. The Act is a legislative mandate which the court must obey and enforce.

It follows that the motion of the Board for an enforcement order must be granted, and the motion of Mutual for a vacation or modification denied. Settle order accordingly.

Concluding, but not as an afterthought, the court thanks counsel for their helpful briefs, which presented the facts and the law with exceptional thoroughness and skill.