NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

John BROWN et al., Respondents.

No. 7089.

United States Court of Appeals Tenth Circuit.

June 17, 1963.

---

3. In our opinion, however, the better practice would be to secure written stipulation or to empanel alternate jurors.

**8**

Melvin J. Welles, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost and Gary Green, Washington, D. C., with him on the brief), for petitioner.

William L. Keller, Dallas, Tex. (Clark, Reed & Clark, Robert L. Clark and Allen Butler, Dallas, Tex., with him on the brief), for respondents.

Joseph M. McLaughlin and Frederick A. Morgan, of McLaughlin & McLaughlin, Los. Angeles, Cal., on the brief for Food Employers Council, Inc., California Ass'n of Employers, California Metal Trade Ass'n, Distributors Ass'n, Employers Council of Monterey County, Inc., Federated Employers of San Francisco, Federated Employers of the Bay Area, Peninsula Employers Council, Sacramento Valley Employers' Council, San Francisco Employers Council, San Francisco Retailers' Council, San Joaquin County Industrial Ass'n, and Valley Employers Ass'n, amici curiae.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

LEWIS, Circuit Judge.

This case presents a single problem but one novel and important in the area of multi-employer bargaining under the National Labor Relations Act. The determinative issue, broadly stated, is whether the non-struck members of a multi-employer bargaining group who have locked out their employees following the initiation of an economic strike against one member of the bargaining group may operate with temporary replacements. The National Labor Relations Board, two members dissenting, found that the hiring of replacements by the non-struck employers rendered the lockout unlawful and hence violative of Secs. 8(a) (1) and 8(a) (3) of the Act. The present petition seeks enforcement of the Board order requiring certain remedial action upon the part of respondents.[1] The alleged unfair labor practices having occurred in Carlsbad, New Mexico, this court had admitted jurisdiction under Sec. 10(e) of the Act. 29 U.S.C.A. § 151 et seq.

The case arises from a factual background which leaves the determinative question free from the complication of

1. Originally named in the charges were Food Jet, Inc. and Lenn Jones, Agent of Multi-Employer Bargaining Association, but each was found not to have violated any provision of the Act. The present petition thus seeks no enforcement aid against either but Food Jet, Inc., is sometimes included in general references made to respondents.

disputed side issues of fact or law. Respondents are operators of seven retail food stores in Carlsbad, New Mexico, who have traditionally bargained upon a group basis [2] with the recognized bargaining agent of its clerical employees, Local 462 of the Clerks International Association. For many years the Union and respondents had enjoyed an amicable relationship and their collective bargaining procedures had resulted in agreements containing a union shop provision and in settling problems of wage increases and similar customary subjects of negotiation. On September 17, 1959, the Union gave notice of its desire to bargain on proposed changes in the then current contract which was due to expire shortly. The notice was not timely but respondents waived the technicality and agreed to bargain. The parties met on January 15, 1960, and both Union and respondents bargained in good faith at numerous sessions thereafter. By February 17, 1960, complete accord had been reached as to all provisions of the new contract except the amount and retroactivity of wage increases. Bargaining continued and at a session held March 2 the Union informed respondents that a strike vote had been taken and a strike authorized. No information was given as to when, how or against whom the threatened strike would be effectuated. Respondents replied that "they would consider a strike against any of them to be a strike against all of them."

On the morning of March 16 the Union struck a single store, Food Jet, Inc.[3] Respondents immediately locked out their employees and informed them they would not be allowed to work for the duration of the strike against Food Jet, Inc. Each store operated on a limited basis during the strike and lockout. Food Jet, Inc., hired replacements for its striking employees; Safeway closed one store but operated another through the transfer of personnel from other areas; the other respondents remained open through the efforts of supervisory employees, relatives and temporary employees hired only for the duration of the controversy. Bargaining between the Union and respondents continued and resulted in an agreement reached on April 22, 1960. All regular employees were immediately returned to work with full status rights and benefits.

■ The decision of the Board that the act of respondents in hiring replacements is discriminatory in violation of Sec. 8(a)(3) and coercive in violation of Sec. 8(a)(1) is not premised upon evidentiary findings of unlawful motivation and hence does not fall within that class of case where an otherwise permissible course of conduct by an employer may be rendered unlawful by the specifics of subjective intent. N. L. R. B. v. James & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; Olin Matheson Chem. Corp. v. N. L. R. B., 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed.2d 562. And see Utah Plumbing & Heating Contractors Assn. v. N. L. R. B., 10 Cir., 294 F.2d 165. But lack of evidence of specific unlawful intent by an employer is not fatal to the decision of the Board if the conduct is such to carry its own indicia of intent sufficient to place the question within the orbit of the Board's prerogative of balancing the legitimate interests of labor and management in furtherance of the general pur-

---

2. Multi-employer bargaining is a recognized and generally successful negotiating procedure of benefit to labor and management alike. Amici Curiae point out that in Southern California approximately 1014 food operators bargain as a single unit with the various Locals likewise coming to the bargaining table together.

3. This action is the initial step in the so-called "whipsaw" strike. Usually the smallest of the group is struck in order to focus the economic burden of the strike at the weakest point. If successful at this point, successive strikes follow against other single members of the group until the final goal is accomplished. The technique is not novel to labor problems and finds use in many aspects of economic, and, indeed, political life.

poses of the Act. N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308. The crux of the Board decision here is premised upon an ultimate finding of unlawful intent based upon indicia appearing from the uncontaminated course of conduct of respondents in hiring replacements. The Board expresses it thus:

> "If the union could successfully strike one at a time, the other members of the employer unit would in ordinary circumstances continue operating to the severe economic damage of the struck member, and each in turn could be driven to the wall in the 'whipsaw'. For this reason, if one member is shut down by a strike, the others may also shut down, but they are not required to do so. If the struck member operates through replacements, no economic necessity exists for the other members shutting down. If in those circumstances they resort to a lock-out and hire replacements, it may be reasonably inferred that they do so not to protect the integrity of the employer unit, but for the purpose of inhibiting a lawful strike. In short, the lockout in these circumstances ceases to be 'defensive' and becomes 'retaliatory'."

Can it be reasonably inferred that the act of hiring replacements, per se, is "retaliatory" rather than "defensive"? We think it cannot and hold that the Board in so doing has misinterpreted and misapplied the principles set forth by the Supreme Court in N. L. R. B. v. Truck Drivers Union (Buffalo Linen), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676, and N. L. R. B. v. Mackay Radio & Tel. Co. (Mackay), 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

■ In Buffalo Linen the Court gave its stamp of approval to the recognition by the Board that after the initiation of a whipsaw strike a threat of strike existed against the other employers which created an economic problem legally justifying a temporary lockout of employees. Basically we interpret Buffalo Linen as upholding the legitimacy of multi-employer bargaining and a recognition that to preserve the equality of such bargaining the employer may resort to self-help when the legitimate interests of employer and employees collide. Thus the efforts of the whipsaw strike to atomize the unity of the multi-employer group can be lawfully neutralized by the utilization of a temporary lockout. The decision in Buffalo Linen went no further for the factual background went no further. In the case at bar neither Food Jet, Inc., the struck employer, nor respondents, who locked out, remained totally inoperative as in Buffalo. Here, each remained in limited operation by hiring temporary replacements.

■ In Mackay, the Supreme Court firmly established the general right of a struck employer to preserve his business by the hiring of replacements for strikers. Such right cannot be exercised in a discriminatory manner however. N. L. R. B. v. Erie Resistor Corp., supra. The decision of the Board in the case at bar recognized the right of the struck employer, Food Jet, Inc., to replace and hence found it, but only it, not in violation of the Act. Although recognizing the right of Food Jet, Inc., to hire replacements under Mackay and the right of respondents to shut down in order to preserve the integrity of multi-employer bargaining under Buffalo Linen the Board reasons that respondents could have stayed operative with their regular employees and thus there was no economic necessity for replacements. The Board's decision states in such regard:

> "Locking out employees in order to replace them with other workers may hardly be viewed as equivalent to the defensive action of a shutdown to preserve the solidarity of the Association unit. On the contrary, since the Respondents were continuing to operate and since no reason appears why they could not have continued to operate with their own employees during the strike, this constitutes a temporary replacement of employees solely because they were en-

gaging in protected concerted activity, i. e., striking against Food Jet."

We agree with the dissenting members of the Board that such view "renders largely illusory the right of lockout given them by the Supreme Court in Buffalo Linen."

The impact of the Board's decision is such that a denial of a basic right by indirection is inherent in it if unity of the multi-employer group is to be maintained. After the initiation of a whipsaw strike the struck employer may remain shut down, the other members of the group may lock out, and the unity of interest is thus maintained. But the struck employer is denied his right of replacement and the whipsaw tactic enjoys a privileged advantage. If, however, the struck employer does choose to operate with replacements and the other employers cannot replace after lockout, the economic advantage passes to the struck member, the non-struck members are deterred in exercising the defensive lockout, and the whipsaw strike again enjoys an almost inescapable prospect of success. Such was not the intent of Buffalo Linen. To the contrary, Buffalo Linen recognizes that a lockout is justified in order to assure "the preservation of the integrity of the multi-employer bargaining unit." It is no answer to say that the respondents could have remained in operation through retaining their regular employees. This merely denies the privilege of lockout and, through denial, refuses any consideration of the existence of the overriding business purpose which, as recognized in N. L. R. B. v. Erie Resistor Corp., supra, may justify the invasion of union rights. The preservation of the multi-employer bargain unit, approved as it is by congressional consideration and judicial decision,[4] is necessary to assure economic justice. It would be largely destroyed by leaving in the hands of the striking agency the power, by law, to determine which employers among the group could remain operative and which could not.

However, we do not understand Buffalo Linen to hold, and we do not hold, that a permissible lockout after the initiation of a whipsaw strike places the locked out employees in the absolute status of the actual strikers. Varying conditions premising the lockout, actual motives arising either before or after the lockout, or any number of possible factors may well bring particular cases within the area of the Board's primary responsibility of balancing legitimate interests by means of its expertise. We do hold that the Board has erred in its interpretation of Buffalo Linen, that the acts of respondents in hiring replacements, presented as they are here against an uncluttered background, do not carry such indicia of intent as to warrant an inference of unlawful motive, that the order of the Board clearly fails to balance the legitimate interests of the parties and constitutes a prohibited determination by the Board of the economic weapons available to employers faced with a whipsaw strike. N. L. R. B. v. Insurance Agents Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454.

Enforcement is denied.

MURRAH, Chief Judge (dissenting).

I would enforce the Board's Order for the very reason which prompted the Supreme Court to enforce the Order in Buffalo Linen. In that case, the non-struck members of the employer unit temporarily locked out their employees, and shut down their operations. The Board, in our case, construed its decision in Buffalo as departing "from a long line of its precedents," to hold that the lock out was not an unfair labor practice, but a "legitimate defensive means of protecting the integrity of the multi-employer bargaining unit against the disintegration threatened by the whip-saw strike." The Supreme Court sustained the Board's Order, as a proper exercise of its administrative function to strike a balance between the conflicting legitimate inter-

4. See Mr. Justice Brennan's discussion in 353 U.S. 95, 96, 77 S.Ct. 647, 648, 1 L.Ed.2d 676.

ests of the two bargaining units. In doing so, the Court emphasized that the balancing of the conflicting interests at the bargaining table was "often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review."

In the process of balancing the conflicting interests in our case, the Board found a "critical difference" between a defensive shut down, in Buffalo, and the lock out and continued operations with replacements, as here. It reasoned that, in the context of our case, "[l]ocking out employees in order to replace them with other workers may hardly be viewed as equivalent to the defensive action of a shutdown to preserve the solidarity of the Association unit;" that "[i]f the struck member operates through replacements, no economic necessity exists for the other members shutting down;" and, that a lock out and replacements, in these circumstances, may form the basis for an inference that such action was taken "not to protect the integrity of the employer unit, but for the purpose of inhibiting a lawful strike."

The Board was, indeed, sharply divided in its analysis and application of Buffalo to the facts of our case, and the consequent inference to be drawn from the respondent's conduct here. But, the majority view, nevertheless, prevails as the specialized judgment of the Board in its "spacious domain of policy," i. e., see: Phelps Dodge v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271, cited and relied upon in Buffalo Linen. In these circumstances, it is not within the judicial prerogative to resolve the contrariety in the Board. It is sufficient, on limited judicial review, that the majority determinations of the Board are within the ambit of policy administration. Certainly, it is not within the judicial prerogative to say that a shut down is illusory, unless the employer is allowed to continue operations with replacements,

for to me, the very statement, on its face, involves the process of balancing conflicting interests at the bargaining table—a function which, as we have seen, is within the Board's exclusive province.