UNITED STATES of America, Appellee,

v.

Chafat AL JIBORI, a/k/a "Jari
Into Kalervo Lundkvist,"
Defendant–Appellant.

No. 1319, Docket 95–1543.

United States Court of Appeals,
Second Circuit.

Argued April 10, 1996.

Decided July 1, 1996.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY (Emily Berger, Y. Hui Chen, Assistant United States Attorneys, of counsel), for Appellee.

Henriette D. Hoffman, The Legal Aid Society, Federal Defender Division, Appeals Bureau, of counsel, for Defendant–Appellant.

Before LUMBARD and KEARSE, Circuit Judges, and MORAN, Senior District Judge.*

MORAN, Senior District Judge:

Chafat Al Jibori (Al Jibori) appeals from a judgment of the United States District Court for the Eastern District of New York entered on September 15, 1995. Al Jibori was convicted by a jury of using a false passport in violation of 18 U.S.C. § 1543. He contends that the district court erred in concluding that the government did not prosecute him in bad faith, a conclusion that led to the denial of his selective prosecution motion. He also challenges the sufficiency of the evidence against him.

### BACKGROUND

#### A. FACTS

Al Jibori arrived at John F. Kennedy International Airport (Kennedy) on September 2, 1994, on a flight from Romania. Based on the record it is unclear exactly what happened when he entered Kennedy's primary immigration inspection area after deplaning. The testimony at trial indicated that he was directed to a secondary inspection area where he was interviewed by an immigration inspector, Mona Farag (Farag), a native Arabic speaker and the only government witness to testify. Farag stated that a second immigration inspector had possession of Al Jibori's passport when she arrived at the secondary area. The inspector promptly gave Al Jibori's documentation to Farag. She noted

that it was a Swedish passport bearing Al Jibori's photograph and the name "Lundkvist." Farag concluded, based on numerous deficiencies in the passport's seal and photograph, that it had been "photo-substituted."

Farag interviewed Al Jibori under oath at the secondary area. Al Jibori admitted that the passport was fake and had been purchased for $5,000 from a Romanian vendor. He stated his real name and that he was a citizen of Iraq and a member of the Shiite Muslim religion. He said that he had come to the United States to see his brothers and to ask for political asylum. He contended that his life was in danger in Iraq due to his brothers' affiliation with a political opposition group. At the end of the interview, Farag informed Al Jibori that he had the choice of going before an immigration judge to pursue his asylum claim or to return immediately to Romania. Al Jibori chose the former option.

#### B. PROCEDURAL HISTORY

Almost two months after Al Jibori's arrival in New York, during which time he was held at an immigration facility in New Jersey, the Immigration and Naturalization Service (INS), through an agent assigned to the Joint Terrorism Task Force at the Federal Bureau of Investigation in New York City (Task Force), approached the United States Attorney for the Eastern District of New York for authorization to prosecute Al Jibori under 18 U.S.C. § 1543 for presenting a false passport at Kennedy. The United States Attorney does not contest that section 1543 is a relatively uncommon statute upon which to premise a prosecution. He contends, however, that he authorized the prosecution based on the Task Force's showing that it was developing a profile of potential security threats. Prior to Al Jibori's attempted entry, an individual from Jordan, who was eventually convicted with regard to the February 1993 bombing of the World Trade Center, had attempted to enter the United States at Kennedy Airport on a flight from Pakistan using a Swedish passport with his photograph pasted on top of the passport-holder's

* Honorable James B. Moran, of the United States District Court for the Northern District of Illinois, sitting by designation.

photograph. That individual had in his possession manuals related to manufacturing explosives.

After Al Jibori was indicted on December 29, 1994, he moved to dismiss the indictment for selective prosecution under Fed. R.Crim.P. 12(b)(1). The government responded by filing a letter and an affidavit stating that although there had been only four section 1543 prosecutions in the Eastern District over the last five years, there had been close to 140 prosecutions under sister statutes 18 U.S.C. §§ 1542, 1544, and 1546 during the same period, each of which, it asserted, could have been brought against defendants who had presented false or fraudulent passports at U.S. points of entry. The district court, noting that the defendant's prima facie showing in selective prosecution cases must include proof that he had been singled out for prosecution, ordered the government to narrow the scope of its data to those cases where, as here, the defendant was charged solely on the basis of presenting a fake passport.

Instead of complying with what turned out to be a burdensome administrative task, the government sought to defeat defendant's motion on the ground that he had failed to show that the government's decision to prosecute had been made in bad faith. Pursuant to this goal, the government submitted the affidavit of Assistant U.S. Attorney Jonathan Sack (Sack), who stated that the decision to prosecute was based on the similarity between Al Jibori's case and that of the terrorist convicted in the World Trade Center bombing, both being middle easterners traveling on altered Swedish passports:

THE COURT: You've got an affidavit, Mr. Buell, that suggests at least in part, apart from the similarities of the passport, that one factor here dealt with his national origin. In other words, there is a paragraph at which Mr. Sach [sic] says that these cases are prosecuted only in particular circumstances, suggesting that they're not routinely prosecuted, and that one predominant factor seems to deal with national origin....

How do you address the argument that he makes based on the contents of the affidavit, that there is an admission that these cases are generally not prosecuted,and one component here that stood out was that he was prosecuted, at least in part, because of where he came from.

MR. BUELL [Assistant U.S. Attorney]: There is no contention on the government's part that that wasn't a factor....

\* \* \* \* \* \*

THE COURT: Is the government then taking this case, where it doesn't take other cases, because of the possibility of this defendant's involvement in terrorist activities?

MR. BUELL: Yes. It's the combination of the place of origin and the mode of entry.

(Transcr. 5/25/95 hearing, pp. 13–15) [A147–49].

MR. BUELL: ... [I]t's important that national origin is not irrelevant in terms of permissible basis for prosecution. And this is in fact, ... an instance in which place of origin does have some relevance.

(*Id.* at 19) [A153].

THE COURT: You're relying on the fact that he comes from the middle east. You're saying that is a component to take into account. So does that suggest that the middle east is—

MR. BUELL: That component was taken into account.

THE COURT: But why is that important?

MR. BUELL: Your Honor, I think it's clear to all of us that there has been significant terrorist activity that has originated out of that region in recent years. And it isn't as if we're just picking the middle east because we don't like that area of the world politically. Clearly, the decision is made here because of past experience....

(*Id.* at 32) [A166]; *see also* Affidavit of Jonathan S. Sack, April 24, 1995, p. 3 (stating that one reason for the prosecution was that "Jibori was from the same region as [a terrorist] (the Middle East)...." [A104] ).

The district court essentially adopted Sack's affidavit as sufficient to extinguish

defendant's claim of selective prosecution, stating that "defendant's resemblance to another defendant who was a known terrorist" was a sufficient "good faith" reason for prosecuting.

### DISCUSSION

■ While the nation's prosecutors retain " 'broad discretion' " to enforce our criminal laws, *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (quoting *United States v. Goodwin,* 457 U.S. 368, 380 n. 11, 102 S.Ct. 2485, 2492 n. 11, 73 L.Ed.2d 74 (1982)), this discretion is bound by constitutional constraints such as the Due Process Clause of the Fifth Amendment, which prohibits a decision to prosecute from being based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

■ The dispute here is not grounded in whether it is unconstitutionally arbitrary to use an accused's national origin as the sole basis for selecting him for prosecution—the government agrees that this would be an improper basis for government action—but focuses instead on the appropriate burdens of proof and production which the accused must meet to make a successful selective prosecution claim. The burden-shifting rules in selective prosecution motions were the subject of a recent Supreme Court case, *United States v. Armstrong,* —— U.S. ——, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). In *Armstrong,* the Supreme Court, in addition to reaffirming the judicial reluctance to look behind prosecutorial decisionmaking, clarified the threshold at which a defendant is entitled to discovery to help prove the claim. *Id.* at ——, 116 S.Ct. at 1488. Under the *Armstrong* standard a defendant must make at least "a credible showing of different treatment of similarly situated persons" to establish a colorable basis for a finding of discriminatory effect and consequently to become eligible for discovery. *Id.* at ——, 116 S.Ct. at 1489. This ruling seriously undermines our holding in *United States v. Berrios,* that "the decision to permit a hearing and, in anticipation thereof, to authorize a subpoena of evidence in the government's possession, lies largely in the trial judge's discretion." 501 F.2d 1207, 1212 (2d Cir. 1974).

Here Al Jibori's initial showing consisted of no credible evidence that the government had declined to prosecute similarly situated suspects from parts of the world other than the middle east. Defendant's initial claim that his religion, political persuasion and request for asylum played a role in the decision to prosecute was not substantiated. As a result, we have no doubt that the motion could have been denied because the initial showing did not reach the *Armstrong* threshold for discovery. The government, however, voluntarily came forward with evidence regarding the number of prosecutions brought under section 1543 and related statutes. The district court concluded that the government's evidence was too broad to dispose of the matter and ordered it to conduct an additional inquiry. This ruling was within the court's discretion under *Berrios,* even though it placed the government in the position "where, having offered a little, [it was] now going to be required to offer a lot more." Appendix, A73 (Transcr. 4/11/95 hearing, p. 13).

Pursuant to *Armstrong,* the government could have refused to comply without causing jeopardy to its prosecution. Instead, it volunteered the Sack affidavit as an alternative demonstration of its good faith, thereby raising the issue whether the case involved "direct admissions by [prosecutors] of discriminatory purpose." —— U.S. at ——, n. 3, 116 S.Ct. at 1488, n. 3. The Supreme Court in *Armstrong* reserved the question whether a defendant must satisfy the similarly situated requirement in those circumstances. *Id.* We believe this case demonstrates why admissions should sometimes justify further inquiry.

■ Here, after the government submitted the Sack affidavit in an attempt to show good faith, the court was left solely with knowledge about two people. One was defendant. He was from Iraq, he was traveling from Romania under a Swedish passport with a photo substitution; he said he had purchased the passport in Romania and he had nothing in his possession suggesting an ulterior motive for his journey. The other was Ahmed Mohammed Ajaj. He was a Jordanian who traveled from Pakistan under

a Swedish passport with a superimposed photograph; he had in his possession manuals related to manufacturing explosives and he was subsequently convicted in the World Trade Center bombing. This information does not tell us very much. Based on the record before us now, we are not persuaded that Al Jibori and the known terrorist attempted to enter the United States in the same unique way.[1] Indeed, as it stands now, other than the superficial similarities between the two defendants' fake passports, the only established commonality between the two is their national (or regional) origin, a consideration which standing alone is an unconstitutional basis for selecting prosecution.

Since the district court ended its inquiry prematurely, we remand in order for it to accumulate more information either for *ex parte in camera* review, or with full disclosure to defendant. We do not envision that the government would have to produce a great deal of additional evidence to warrant denial of defendant's motion. The district court could be satisfied with a showing that (1) the convicted terrorist obtained his fake Swedish passport in Romania, as Al Jibori allegedly did; (2) defendant matched the alleged terrorist profile, and the government's newfound proactivity with regard to passport violations was not a one-time selective exercise; or (3) a substantial number of the prosecutions under sections 1542, 1544, 1546 were of defendants from other areas of the world and sufficiently similar to this case. This is not intended to be an exhaustive list.

■ In the interests of expediency, we note that if after a supplemental showing by the government the district court reissues a denial of defendant's motion, we would not be inclined to accept defendant's alternative argument that there was insufficient evidence to convict. To make its case under section 1543, the government must prove that a defendant knowingly possessed an altered passport and intentionally used it in an effort to disobey the laws of the United States. The government in this case relied on inferences

to prove beyond a reasonable doubt two of the elements of the offense: that Al Jibori (1) "used" the altered passport (2) with the intent to break the law. Inference, rather than direct evidence, was necessary because the government was not able to reconstruct with any precision what happened at Kennedy's primary immigration inspection area.

■ The defendant bears a "heavy burden" in making an insufficiency of evidence claim. *See U.S. v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995) (citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 545, 133 L.Ed.2d 448. Nevertheless, when a jury finds—based solely on inferences—that the government proved an *element* of a crime, a reviewing court must be satisfied "that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* at 1043 (citations omitted). Here, inferences provided the sole support for *two* elements of the crime under which Al Jibori was convicted.

The jury apparently based its ruling with regard to these elements on inferences drawn from the following facts: (1) Al Jibori had been directed to the secondary inspection area, which is used primarily (or perhaps exclusively) when inspectors in the primary inspection area find that documentation is out of order in some respect; and (2) when Inspector Farag first arrived on the scene other inspectors already had possession of Al Jibori's altered passport. We find that the jury could reasonably infer from these facts that Al Jibori proceeded through the primary area, as all other passengers, and presented his passport to a primary area inspector who detected the defects in it, seized it, and sent Al Jibori to the secondary area to be interviewed. These reasonable inferences sufficiently support each of the elements at issue and Al Jibori's conviction was not invalid for lack of evidence.

### CONCLUSION

We conclude that the judgment be remanded to the district court for further in-

---

1. We note that the paucity of section 1543 prosecutions is not surprising given the probability that most individuals who are caught with fake passports opt to return to the country from which they embarked rather than staying to

claim political asylum, as Al Jibori did here. Thus, Al Jibori is probably not entitled to discovery based solely on the prosecutorial statistics presently in the record.

quiry into defendant-appellant's selective prosecution defense. If the district court denies defendant's motion after hearing new evidence, the jury's verdict should stand because it was based on sufficient evidence.

LUMBARD, Circuit Judge, dissenting:

I would affirm both the district court's denial of Al Jibori's selective prosecution motion and his conviction.

The district court properly concluded that the government did not selectively prosecute Al Jibori because of his national origin. Al Jibori has offered no substantial evidence other than the Sack affidavit to show that he has been selectively prosecuted, and nothing in the Sack affidavit suggests that "the government's selection of [Al Jibori] for prosecution has been invidious or in bad faith." *United States v. Fares,* 978 F.2d 52, 59 (2d Cir.1992).

According to the Sack affidavit, the INS recommended Al Jibori's prosecution for two reasons. First, the INS was "seeking to increase preventive law enforcement efforts ... at Kennedy Airport." Second, Al Jibori was "from the same region" and "had used a comparable means of entry into the United States" as another individual, Ahmad Mohammad Ajaj, who had earlier been convicted of passport fraud and was subsequently convicted for his involvement in the February 1993 bombing of the World Trade Center. Sack stated that he authorized Al Jibori's prosecution based on this information.

These reasons do not make out a prima facie showing of invidiousness or bad faith. At most, the affidavit proves that Al Jibori's Middle Eastern origin was one of two characteristics Al Jibori shared with Ajaj. While the majority dismisses the second shared characteristic—the use of an altered Swedish passport to gain entry into the United States—as "superficial," there is no evidence to suggest that the coincidence of Middle Eastern origin and the use of an altered Swedish passport is so commonplace that the government acted in bad faith in relying upon it.

Nor does anything in the Sack affidavit require us to remand to gather additional evidence from the government. A defendant is not entitled to discovery on the issue of invidiousness or bad faith without "some evidence tending to show the existence" of discriminatory intent on the government's part. *United States v. Armstrong,* —— U.S. ——, ——, 116 S.Ct. 1480, 1488, 134 L.Ed.2d 687 (1996) (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). The majority instead asks the government to provide additional evidence supporting its decision to prosecute in the hope that it might unearth something "warranting denial of Al Jibori's motion." I disagree. First, the burdens of proof and production rest not with the government but with the defendant, at least until the defendant has made a prima facie showing of selective prosecution. *See Fares,* 978 F.2d at 59. I do not believe—and the majority does not state—that Al Jibori has made such a showing. Second, I believe that granting additional discovery is unwise. Any similarities between Al Jibori and Ajaj or between Al Jibori and the INS's terrorist profile not yet disclosed are likely to be highly sensitive facts that we should not require the government to reveal, whether to the public or to the court for in camera review, unless we have good reason to believe that the government is acting in bad faith. Al Jibori has given us no such reason. Likewise, we should not require the government to release its terrorist profile or its policy on investigating or prosecuting passport fraud at Kennedy Airport.

The Supreme Court has emphasized that "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). "Examining the basis of a prosecution ... threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* There is consequently a strong presumption that a prosecutor has not engaged in discriminatory conduct, which may be overcome only by "clear evidence to the contrary." *Armstrong,* —— U.S. at ——, 116 S.Ct. at 1486. This case illustrates the dangers of granting discovery on unsubstantiated selective prose-

cution motions. Having offered virtually no evidence in support of his claim, Al Jibori has managed to expose part of the government's strategy in screening potential security threats entering the United States. The majority would now put the government in the position of disclosing further pieces in its strategy simply to corroborate its own intuition that the government did not act in bad faith.

Since I also believe that there was sufficient evidence to convict, I would affirm the judgment of the district court.