**UNITED STATES of America,**

v.

**James SANDERS and Elizabeth Sanders, Defendants.**

**No. 98–CR–013 (JS).**

United States District Court, E.D. New York.

Aug. 27, 1998.

---

Benton Campbell, Assistant United States Attorney, Brooklyn, NY, for U.S.

Jeffrey Schlanger, New York City, for Defendant James Sanders.

Jeremy Gutman, New York City, for Defendant Elizabeth Sanders.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court is defendants' joint motion for pretrial discovery relating to their defenses of selective and vindictive prosecution. The defendants were indicted on January 6, 1998 under 49 U.S.C. § 1155(b), which prohibits the unauthorized removal of aircraft parts from any plane involved in a civil aviation accident, and for conspiracy to violate the statute. The two count indictment alleges that between October 1996 and July 1997, the defendants conspired to remove a portion of a seat cushion from the interior cabin of the now-infamous TWA Flight 800. The defendants allegedly conspired with Terrell Stacy, a former TWA pilot, to have him cut a piece of the fabric from the cushion that was being stored in a secured hangar Calverton, New York during the accident investigation of the National Transportation Safety Board ("NTSB") and the Federal Bureau of Investigations (the

"FBI"). The defendants allegedly sought the material because it contained samples of a reddish brown residue, which defendant James Sanders believed would prove his theory that a Navy missile was responsible for the downing of Flight 800.

### DISCUSSION

The defendants have jointly moved for discovery pertaining to their claim that the determination to bring criminal charges against them was motivated by the Government's desire to retaliate against them for exercising their First Amendment free speech rights, as well as to chill those rights. Thus, defendants purport to seek discovery of information and documents in the Governments' possession that are relevant to the Government's decision-making process and its motives for prosecuting the present case.[1]

As a preliminary matter, the Court must address the defendants' contention that their conduct in obtaining the fabric from the wreckage was protected by a First Amendment "newsgathering" privilege. See United States v. Cutler, 6 F.3d 67 (2d Cir.1993); United States v. Burke, 700 F.2d 70 (2d Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). Under this privilege, defendants contend that the acts the defendants are charged with all relate to the constitutionally protected process of newsgathering because James Sanders was a freelance journalist and was investigating the crash of Flight 800 for newsgathering purposes. Elizabeth Sanders, in assisting her husband, was also engaged in the newsgathering process.

While the Court recognizes that there is a "reporter's privilege" with respect to certain information subpoenaed in civil and criminal proceedings, this privilege clearly does not apply as a shield against prosecution for violation of laws of general applicability. Indeed, in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626

---

1. Defendants have failed to indicate exactly what documents they believe the government has that would prove a speech-based animus in bringing this prosecution. Although they point to discussions with the prosecution regarding discovery requests, the Court has reviewed those requests and find that the bulk of items they still seek relate to data and documents relating to the crash itself rather than the prosecution.

(1972), the Supreme Court stated that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682, 92 S.Ct. at 2657. Thus, the press may not use First Amendment protection to justify otherwise illegal actions. *See United States v. Sanusi,* 813 F.Supp. 149, 155 (E.D.N.Y.1992) (citing *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.")). As Judge Weinstein aptly stated in *Sanusi,* "[b]ecause the press in certain circumstances may be able to resist the demands of a subpoena, does not mean the press may, simply by raising the cry of 'newsgathering,' exempt itself from all ordinary legal constraints." *Id.* (citing *Galella v. Onassis,* 487 F.2d 986, 995–96 (2d Cir.1973)) ("There is no threat to a free press in requiring its agents to act within the law.").

■ Accordingly, the Court rejects defendants' argument that they are immune from prosecution for the acts alleged in the indictment on the basis of a newsgathering privilege. The Supreme Court has been clear that the "First Amendment confers no such immunity from prosecution." *Wayte v. United States,* 470 U.S. 598, 614, 105 S.Ct. 1524, 1534, 84 L.Ed.2d 547 (1985). The Second Circuit has reiterated this principle and found that where the facts involve the exercise of prosecutorial discretion and "speech" and "nonspeech" elements are combined in the same course of conduct, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. Fares,* 978 F.2d 52, 59 (2d Cir.1992) (citing *Wayte,* 470 U.S. at 611, 105 S.Ct. at 1532). Indeed, the Court also notes that 49 U.S.C. § 1155(b), under which defendants are indicted, does not facially implicate First Amendment concerns and the defendants do not raise any challenges to the statute itself as a valid exercise of government power.

The Court now turns to defendants' motion for discovery relating to their defenses of selective and vindictive prosecution.

## I. STANDARDS GOVERNING MOTIONS FOR CRIMINAL DISCOVERY

■ A selective prosecution claim is not a defense on the merits to a criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *United States v. Armstrong,* 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996). The standard for demonstrating selective prosecution, however, is a "rigorous" one. *See id.* at 468, 116 S.Ct. at 1488. To prevail on such a defense requires the defendants to overcome the strong presumption of regularity on the part of federal prosecutors, and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* at 464, 116 S.Ct. at 1486 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). In the ordinary case, therefore, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978)).

■ Before the defendants are entitled to discovery or an evidentiary hearing on a claim of selective prosecution, they must make two showings. First, the defendants must present at least " 'some evidence tending to show the existence of the essential elements of the defense.' " *Fares,* 978 F.2d at 59 (quoting *United States v.. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). This standard applies whether termed as providing a "colorable basis," "substantial threshold showing," "substantial and concrete basis," or "reasonable likelihood." *See Armstrong,* 517 U.S. at 468, 116 S.Ct. at 1488. Second, the defendants must show that the documents in the government's possession would indeed be probative of these elements. *See*

*Fares,* 978 F.2d at 59 (quotation omitted). The basis for this requirement is to prevent unwarranted fishing expeditions to obtain documents to which the defense normally would not be entitled. *See Berrios,* 501 F.2d at 1211.

Accordingly, under the *Armstrong* standard, a defendant must make at least "a credible showing of different treatment of similarly situated persons" to establish a colorable basis for a finding of discriminatory effect and consequently to become eligible for discovery. *See Armstrong,* 517 U.S. at 470, 116 S.Ct. at 1489; *see United States v. Al Jibori,* 90 F.3d 22, 25 (2d Cir.1996). In this regard, mere assertions and generalized proffers on information and belief are insufficient. *Fares,* 978 F.2d at 59.

### A. Evidence Establishing the Elements of the Defense

▇ The prima facie elements of a claim for selective prosecution are twofold. The defendants must first show that they have been singled out for prosecution while others "similarly situated" have not generally been prosecuted for the same type of conduct forming the basis of the charges against them. *See United States v. Moon,* 718 F.2d 1210, 1229 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (quotation omitted). If the defendants can establish that "similarly situated" persons were not prosecuted, they must then show that the government's discriminatory selection of the defendants for prosecution has been invidious or in bad faith; i.e., based upon such impermissible considerations as race, religion, or the desire to prevent their exercise of their constitutional rights. *Id.* In this case, therefore, the defendants have the demanding burden of producing some evidence tending to show both that "similarly situated" individuals were not prosecuted and that the decision to prosecute them was animated by a desire to "chill" the exercise of defendants' First Amendment rights or to retaliate against them for the exercise of constitutional rights. *See Armstrong,* 517 U.S. at 469, 116 S.Ct. at 1488.

### 1. "Similarly Situated" Individuals

▇ To sustain their burden with respect to identifying "similarly situated" individuals, defendants point to two facts. First, they believe that there must be "numerous incidents" of souvenir hunters who have stolen parts of aircraft wreckage, which was also an offense under § 1155's predecessor statute enacted in 1962, Pub.L. 87–810. This speculation, however, is insufficient to provide some credible evidence establishing that others similarly situated were not prosecuted. In *Berrios,* the Second Circuit expressly rejected a nearly identical argument by the defense and found that a proffer stating that the defendant and his attorney believed that there were "hundreds" of unprosecuted persons similarly situated to defendant was insufficient because it failed to identify any unprosecuted violators. *See* 501 F.2d at 1211.

▇ Second, the defendants also suggest that James Kallstrom, the Assistant Director in Charge of the New York FBI Office, is a similarly situated person who was not prosecuted. James Sanders himself describes Kallstrom as the FBI official in charge of the Flight 800 investigation. Sanders Aff. ¶ 21. Nevertheless, defendants assert that Kallstrom was not prosecuted after it was reported that he removed an American flag found among the wreckage and presented it to the son of one of the victims. The Court easily rejects this comparison. First, § 1155(b) clearly provides that only "unauthorized" removal of aircraft wreckage is a violation.[2] Second, Mr. Kallstrom's action in presenting an American flag to the son of one of the victim's as an official act can hardly be considered to be "conduct of the type forming

---

**2.** Defendants assert that the government has failed to provide any evidence that Mr. Kallstrom actually was "authorized" to make this presentation. The Court rejects this argument as well. Initially, the Court notes that it would be hard pressed to conclude that the FBI official in charge of the investigation would not be authorized to make an official presentation such as here. Moreover, the burden is not upon the government to establish that Mr. Kallstrom was not similarly situated; rather, the burden is on defendants to provide evidence that he was similarly situated. They have failed in that regard.

the basis of the charge" against these defendants. *See Moon,* 718 F.2d at 1229.

The government, on the other hand, has provided a copy of a 1996 criminal information and complaint in the Southern District of Florida against Michael Gadsden, a man accused of removing wreckage from the Valujet crash in the Everglades in 1996. Gadsden was an employee under contract to remove the remaining aircraft parts from the crash site and deliver it to a hangar for investigation by the NTSB and the FBI. A search of Gadsden's apartment revealed that he unlawfully possessed a circuit breaker panel and a portion of the aircraft fuselage that Gadsden had kept as "souvenirs." Like the Sanders, Gadsden was prosecuted pursuant to 49 U.S.C. § 1155(b).

The defendants raise a number of arguments attempting to distinguish the prosecution of Gadsden. For example, they point to the fact that he was also accused of denying having the wreckage parts when interviewed by the FBI and that there is no evidence that Gadsden would have been prosecuted if he had not lied to federal agents.[3] In addition, the part stolen by Gadsden was a circuit breaker relevant to the investigation of the crash. Here, however, they claim that their conduct is minimal in comparison because there was ample other seat portions available for government testing and the fabric was not "vital to the accident investigation." Pub.L. 87–810. Defendants also suggest that Gadsden's motive for removing the wreckage as a souvenir also falls squarely within the purpose of § 1155(b) to stop souvenir hunters from carrying off parts of aircraft wreckage. In this case, on the other hand, the parts were taken not as souvenirs, but to further the investigation of the cause of the explosion. Finally, the Sanders suggest that a distinction exists because they were not the principals who removed the property and the government has failed to uncover any instances of "accessorial liability" under the statute that have been prosecuted. They conclude that to be "similarly situated," a defendant would have to have done no more

than relay a journalist's desire for such material to a participant in the official investigation to be prosecuted. The Court simply disagrees with this latter assertion. The indictment charges much more than a simple relay of a message from Sanders to Stacy; rather, the indictment charges that the Sanders actively conspired to have the fabric removed from the hangar and delivered to James Sanders.

The Court rejects defendants' attempt to distinguish the Gadsden prosecution. The burden is on defendants to provide some evidence establishing that another individual was *not* prosecuted for conduct similar to that of their own. In their moving papers, they make the speculative assertion that there must be "numerous incidents" of souvenir hunters from aircraft crash sites that could have been prosecuted under 49 U.S.C. § 1155(b) or its predecessor statute and were not. When the government came forward with an example of such a souvenir hunter who was charged with a violation of § 1155(b), they then switched their position to claim that souvenir hunters are not similarly situated. Moreover, the Court finds that the prosecutions of Gadsden and the Sanders are sufficiently similar to convince the Court that the defendants have failed in their efforts to establish evidence tending to support the first prong of a selective prosecution defense. On this basis alone, the Court could deny the motion for discovery. Notwithstanding, the Court will consider the second element of their selective prosecution claim.

### 2. *Impermissible Considerations*

 The defendants contend that they have provided sufficient evidence to meet their threshold showing that the present prosecution was motivated by a desire to chill the defendants' exercise of rights protected under the First Amendment, or to retaliate against them for exercising those rights. In support of this argument, they rely on the Second Circuit's decision regarding a motion to dismiss in a § 1983 action, *Gagliardi v. Village of Pawling,* 18 F.3d 188 (2d Cir.1994),

---

**3.** Nor have defendants pointed to any evidence suggesting that he would *not* have been prosecut-

ed if he had not lied to officials.

for the proposition that retaliatory intent can be inferred from the chronology of events in the government's conduct. *See* 18 F.3d at 195.

Specifically, the defendants point to the following "evidence" of a discriminatory or retaliatory animus:

(1) On March 10, 1997, the Riverside *Press–Enterprise* published a front page story reporting Mr. Sanders' acquisition of a sample of red residue from TWA Flight 800 and his conclusion that the residue was solid missile fuel.

(2) On March 11, 1997, during testimony before the House of Representatives, a senior NTSB official attempted to discredit Mr. Sanders' theory and stated on the record that "there is no such thing as a red residue trail in that airplane," In complete contradiction, FBI Special Agent James Kinsley stated in his affidavit supporting defendants' arrest warrants on December 5, 1997 that "[f]rom Row 17 to Row 28 of the seating area, there is a reddish residue on the metallic frame and backs of the passenger seats" that is "manifested strongly on seats from Rows 17 through 19."

(3) Within hours after the publication of the *Press–Enterprise* article, the FBI initiated aggressive efforts to question Elizabeth Sanders, although she stated that she did not wish to speak with the FBI.

(4) Also immediately following the publication of the *Press–Enterprise,* grand jury subpoenas were issued to obtain Mr. Sander's testimony, as well as toll records from the Sanders' telephone service provider, even though it was obvious that Mr. Sanders was acting as a journalist. The Department of Justice concedes that it approved these subpoenas in violation of its own rules regarding seeking subpoenas relating to members of the news media. *See* 28 C.F.R. § 50.10.[4]

(5) In April 1997, prosecutors threatened James Sanders with prosecution if he would not reveal his confidential source within the FBI/NTSB crash investigation. Mr. Sanders refused to cooperate on the basis of his First Amendment rights. At the same meeting, prosecutors also threatened to make Elizabeth Sanders a target if she did not agree to cooperate in the investigation of her husband, even though at that time they had absolutely no evidence of her involvement.

(6) In late April 1997, James Sanders published his book, *The Downing of TWA Flight 800,* which also detailed the information he had gathered and asserted that the government was covering up the fact that the flight was downed by a Navy missile. The book's acknowledgments thanked Elizabeth Sanders.

(7) Shortly after publication of this book, the FBI attempted to question Elizabeth Sanders' supervisor and another close friend and colleague.

(8) The government issued a second subpoena for James Sanders' telephone records in August 1997, again in violation of 28 C.F.R. § 50.10.[5]

(9) Mr. Sanders filed Freedom of Information Act ("FOIA") requests in August, September and October 1997, seeking information relating to FBI Assistant Director James Kallstrom, FBI Special Agent James Kinsley, Assistant United States Attorney Valerie Caproni and Assistant United States Attorney Benton Campbell.

(10) On November 18, 1997, Mr. Sanders reported to a New York Post

---

**4.** As to the violation of 20 C.F.R. § 50.10, the government points out that once it was discovered that Sanders was a member of the media and was publishing a book on the subject, they sought and obtained *nunc pro tunc* approval from the Attorney General on August 21, 1997.

**5.** *See supra* note 3.

reporter that he was using the FOIA requests to investigate the prosecutors and FBI agents involved in the investigation of him and his wife.

(11) On November 19, 1997, the Post reporter published an exclusive story, quoting Valerie Caproni of the United States Attorney's Office for the Eastern District of New York as stating that the Justice Department was not required to follow its regulations because there was no basis to conclude that Mr. Sanders was acting as a reporter and that charges would be filed within two weeks.

(12) On December 5, 1997, FBI Agent Kinsley's affidavit in support of defendants' arrest warrants was released to the press without notification to the Sanders or their attorneys. On the same day, the FBI issued a press release stating that James Sanders had misrepresented the results of his lab reports of the red residue.

(13) In December 1997, at the time defendants surrendered, Agent Kinsley arranged to have the defendants paraded in front of the press in their handcuffs even though more discreet actions could have been taken.

(14) On December 12, 1997, Terrell Stacy, the Sanders' contact inside the investigation, stated during his plea allocution that he took the fabric samples on his "own volition" and gave them to James Sanders to analyze.

(15) On January 6, 1998, the Sanders were then indicted four weeks later on the grounds that they orchestrated the efforts to have Stacy remove the fabric samples.

On the basis of this chronology, the defendants argue that they have made the required threshold showing that the government's instigation and indictment of the Sanders was in retaliation for their efforts to publicize their theory that a Navy missile was the cause of the Flight 800 explosion. The defendants thus point to three triggering events for the retaliation: (1) the publication of the initial article in the *Press–Enterprise,* which resulted in aggressive questioning of both James and Elizabeth Sanders, threatening indictment of Elizabeth and disregarding DOJ's own regulations in subpoenaing records; (2) the publication of James Sanders' book, which resulted in heightened questions of Elizabeth Sanders' colleagues and friends and additional improper subpoenas; (3) the FOIA request for information regarding the U.S. Attorneys and FBI agents involved, which resulted in defendants arrest and arraignment, the press release again discrediting Sanders' conclusions and the public humiliation during the Sanders' surrender.

The Court has reviewed these allegations and finds that the defendants have failed to establish a substantial and concrete basis sufficient to allow further discovery to overcome the presumption of regularity on the part of federal prosecutors. *See Armstrong,* 517 U.S. at 464, 116 S.Ct. at 1486.

First, as the government points out, *Gagliardi* involved the burden of proof necessary to survive a motion to dismiss in the civil context on a claim of unlawful retaliation. The precedent set forth in *Armstrong, Berrios* and *Fares* make clear that a defendant seeking discovery on selective prosecution and vindictive prosecution claims bears the burden of making a credible showing of some evidence before discovery will be provided. Although the Court does recognize that circumstantial evidence is relevant and admissible in both the criminal and civil context, the circumstantial evidence presented in the chronology above does not persuade the Court that this is credible evidence that tends to show the existence of a discriminatory or retaliatory animus against the defendants.

Perhaps defendants' chronology would have more weight if James Sanders in the March 10, 1997 *Press–Enterprise* article had merely propounded his theory that a missile downed Flight 800. The article, however, goes much further. It expressly states that "He used classified documents obtained from

a confidential source inside the official investigation," "Someone whom Sanders declined to identify passed him a 104–page printout of the FBI–NTSB catalog of every article recovered from the undersea crash site," that "Sanders said he later obtained samples of the residue" and that "The residue test was initiated by James Sanders, who said he obtained pieces of one of the seats." Prominently placed on the front page of the newspapers is a also color photograph of the "samples of seat material with residue." Based on these statements, the Court agrees with the Government that the article raised serious doubts about the security of the hangar and clearly indicated a potential violation of 49 U.S.C. § 1155(b).

As to the April 1997 meeting, the Government asserts that prosecutors attempted to gain James Sanders' cooperation in locating the source inside the NTSB investigation who was providing portions of the wreckage to him. When Sanders indicated that he would rely on the "shield law" to protect his source, the Government informed Sanders that his refusal to cooperate may lead to his own indictment. The Court agrees that this chronology does not present objective evidence of vindictiveness. *See, e.g., United States v. Goodwin,* 457 U.S. 368, 383, 102 S.Ct. 2485, 2494, 73 L.Ed.2d 74 (1982) (pursuing felony charges after defendant rejects misdemeanor plea is not vindictive prosecution); *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978) (no vindictive prosecution when the government presents the defendant with the "unpleasant alternatives" of forgoing trial or facing charges on which he was plaintiff subject to prosecution).

The Government also denies that it threatened to charge Elizabeth Sanders at this meeting. Rather, Government prosecutors asked Jeffrey Schlanger to ask Ms. Sanders whether she would meet with investigators for an interview, and Mr. Schlanger said he would communicate the request. Mr. Schlanger later informed government officials that she would not consent to an interview on the grounds of her spousal and Fifth Amendment privileges. Sanders was informed at the meeting, however, that if the investigation revealed involvement of his wife, who was a TWA employee, there was no guarantee that she would not be prosecuted. Regardless of this apparent factual dispute as to what exactly was stated at this meeting, the Court finds that any potential "threats" of indictment based on either of the defendants' failure to cooperate in the investigation does not support their contention of selective or vindictive prosecution for the reasons stated above.

As to the November 1997 FOIA requests regarding FBI Assistant Director James Kallstrom, FBI Special Agent James Kinsley, AUSA Valerie Caproni and AUSA Benton Campbell and the New York Post article on November 19, 1997, the Court also agrees with the Government that these events do not make a "credible showing" of vindictiveness to warrant discovery. The Government has provided a letter from the Department of Justice indicating that the decision to prosecute James and Elizabeth Sanders was made in September 1997, when prosecutors requested authorization from the Attorney General to indict them for their involvement with the removal of the fabric from Flight 800. That authorization was granted on November 17, 1997, and defendants were arrested shortly thereafter. Govt. Ex. D. Any link between the FOIA requests, the information in the Post and the arrest appears to be speculative at best, which is insufficient to meet the required threshold showing. *See Fares,* 978 F.2d at 60. As noted in *Moon,* "highly visible cases will always engender some suspicion with respect to the government's bona fides. But to engage in a collateral inquiry respecting prosecutorial motive, there must be more than mere suspicion or surmise." 718 F.2d at 1230.

The Court also notes that in light of the fact that the decision to prosecute was made in September 1997, the defendants "additional evidence" of a December 5, 1997 Department of Justice press release, in which the Government again attempts to discredit Sanders' theory, does not alter this result. The fact that government investigators disagree with Mr. Sanders' conclusions does not indicate to the Court that there was a speech-based animus underlying the present

prosecution. Similarly, the Court does not find that the defendants can meet their burden under *Armstrong* through their general assertions that this prosecution is unjustified and unwarranted because it was a "crime without a victim" and because there was more than sufficient residue left for government testing.

Accordingly, the Court concludes that the defendants have failed to provide any credible evidence tending to substantiate their claims that there were others who were similarly situated and not prosecuted and that the decision to prosecute was based on a desire to silence Mr. Sanders' theory that a missile downed Flight 800. The Court now considers defendants' claim for discovery of the defense of vindictive prosecution.

## II. STANDARDS GOVERNING CLAIMS OF VINDICTIVE PROSECUTION

The doctrine of prosecutorial vindictiveness has its roots in two Supreme Court decisions: *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) and *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). *United States v. King*, 126 F.3d 394, 397 (2d Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1308, 140 L.Ed.2d 472 (1998). The tenet has developed from these cases that due process is violated when actual vindictiveness plays a part in a prosecutorial or sentencing decision, and thus even the appearance of vindictiveness must be avoided. *See King*, 126 F.3d at 397. Thus, although the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), the decision to prosecute violates due process when the prosecution is brought in retaliation for the defendant's exercise of his legal rights. *United States v. White*, 972 F.2d 16, 19 (2d Cir.), *cert. denied*, 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992) (citing *Blackledge*, 417 U.S. at 27, 94 S.Ct. at 2102; *United States v. Khan*, 787 F.2d 28, 31 (2d Cir.1986)).

The need to avoid the appearance of vindictiveness has taken the form of a rebuttable presumption of vindictiveness. *King*, 126 F.3d at 397 (citing *United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 2488–89, 73 L.Ed.2d 74 (1982)). This presumption, however, is applied only when the circumstances of a case pose a "realistic likelihood" of such vindictiveness. *Id.* (citation omitted). When the presumption is applied, it may be rebutted "by objective evidence justifying the prosecutor's action." *Id.* (quoting *Goodwin*, 457 U.S. at 376 n. 8, 102 S.Ct. at 2490 n. 8).

The Second Circuit in *White* held, however, that this "Circuit has limited the application of such a presumption to prosecutions brought after post-conviction activity of defendants." 972 F.2d at 19 (citing *Lane v. Lord*, 815 F.2d 876, 878 (2d Cir.1987)). Consequently, the "presumption of prosecutorial vindictiveness does not exist in a pretrial setting." *Id.* (quoting *United States v. Hinton*, 703 F.2d 672, 678 (2d Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3091, 77 L.Ed.2d 1351 (1983)).

A defendant claiming vindictive prosecution must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a "stalking horse," and (2) he would not have been prosecuted except for the animus. *United States v. Aviv*, 923 F.Supp. 35, 36–37 (S.D.N.Y.1996) (citations omitted). Where as here there is no presumption of vindictiveness, and as with a claim for selective prosecution, to obtain discovery the defendant must show a "colorable basis" for the claim that the prosecution was the product of vindictive retaliation. *Aviv*, 923 F.Supp. at 37. The standard, as stated above, requires the defendant to offer some evidence supporting both elements of the claim. *Aviv*, 923 F.Supp. at 37.

Importantly, the Second Circuit in *White* found that allegations of vindictiveness based upon alleged government violations of its internal guidelines and alleged improper supervision of the Assistant United States Attorney were also insufficient to warrant a finding of vindictiveness. Rather, the defendant must come forward with "proof of actual vindictiveness in the form of objective evidence that overcomes the presumption of legitimacy of the prosecutor's charging deci-

sion." 972 F.2d at 19 (citing *Goodwin,* 457 U.S. at 384 n. 19, 102 S.Ct. at 2494 n. 19). Accordingly, the Court rejects defendants' contention here that the failure to gain Department of Justice approval to subpoena Mr. Sanders' telephone records, which was obtained *nunc pro tunc* in any event, provides objective evidence of vindictiveness.

The defendants also contend that the substantial evidence tends to show that the government's animus against them arises from an interest in suppressing their theory that a missile caused the Flight 800 crash. The "objective evidence" in support of this argument is based on what defendants feel is proof that the actual cause of the crash was a missile. In addition, they point to "misrepresentations" about the NTSB's test results finding that the reddish brown substance was an adhesive used on the seats in question. They also make semantical arguments as to the government's use of the term *aircraft* "wreckage" to characterize the fabric that was removed and whether Sanders gave Stacy "persistent instructions" to remove the fabric.

The Court finds that any evidence that defendants may have or want regarding the validity of the NTSB's determination as to the cause of the Flight 800 crash does not weigh in favor of overcoming the presumption of regularity in the prosecution of this action. The inquiry in a vindictive prosecution defense is whether but for vindictiveness on the part of the prosecution the indictment would have been sought. In light of the plain statements in the March 10, 1997 article and the evidence that subsequently came to light, the Court cannot conclude that there is any objective and direct evidence indicating a vindictive motive to quash the Sanders' constitutional right to hypothesize at will over the cause of the crash. Rather, the only objective evidence presented is that James Sanders published an article clearly indicating his possession of a piece of the Flight 800 aircraft and his ability to obtain it along with other information from a source inside the secured hangar in Calverton, New York. There is nothing in this objective evidence to overcome the strong presumption of prosecutorial regularity.

## CONCLUSION

For the foregoing reasons, the defendants' joint motion for pretrial discovery is denied.

SO ORDERED.